**22 P.(2d) 119**

**TRIGG v. TRIGG.**

No. 3735.

Supreme Court of New Mexico.
April 20, 1933.

Rehearing Denied June 2, 1933.

Reid & Iden, of Albuquerque, for appellant.

Chas. W. G. Ward, of East·Las Vegas, for appellee.

ZINN, Justice.

Appellee, plaintiff below, brought suit against appellant, defendant below, to cancel deeds of conveyance made on August 27, 1927, executed by the appellee and appellant to one J. H. Barwise, an attorney, for a stated consideration of $1, which deed of conveyance transferred the property in question, consisting of a large ranch located in San Miguel county, to the said J. H. Barwise, who then and at the same time conveyed the property to the appellant by a deed of conveyance for a stated consideration of $1. The deeds were in the usual warranty deed form. The primary and admitted purpose of this transfer of the property from the appellee to appellant, through J. H. Barwise, was to place the property in dispute in the name of the appellant, the wife of the appellee.

: The allegations of the complaint material to the issue are that the appellee and appellant are husband and wife, and that the appellee was the owner of a large ranch in San Miguel county, N. M., which was of the community property of appellee and appellant; that the appellant threatened the appellee to abandon his bed and board unless he did convey this ranch property to her, and that on August 27, 1927, worried by the constant importunities and "nagging" of the appellant, and relying upon the agreement of the appellant that the property would remain community property, appellee executed a deed of conveyance vesting title to the property in appellant, but intending the same to remain the community property of the appellee and appellant, and that subsequent to the conveyance the appellant did abandon and desert the appellee, refusing to live with him as his wife; the complaint alleges that it was the deliberate purpose of the appellant to defraud the appellee by inducing him to convey the property to her and thereafter. to desert and abandon him. The appellant contended that the conveyance of the property was a gift, in lieu of a home, and as the donee of such gift she was the sole owner of said property.

The case was tried before the district court of San Miguel county, where the issues were found for the appellee, and the court ordered that the deed from appellee and appellant to J. H. Barwise and the deed from J. H. Barwise to the appellant be canceled, and the property was held to be community property of the appellee and appellant, from which judgment and decree the issue is here on appeal.

■ It appears from the record that the means adopted by J. H. Barwise, a reputable and respected member of the bar of the state

of Texas, in having the appellant and appellee join in a deed of conveyance to him of the property in question, and thereafter by deed from him to appellant, conveying the property to her, was a method employed and intended to obviate the common-law disability of husband and wife to convey to each other directly. The common-law disability of husband and wife to convey, the one to the other, has, however, been expressly removed by statute in this state, and the husband may convey real estate directly to the wife and the wife directly to the husband without the other joining in the conveyance. 1929 Comp. St. § 68-403. That the circuitous transfer of the property in question in this case through J. H. Barwise was intended to effect a transfer from the appellee to the appellant is admitted by all parties, and the legal effect of the method employed in conveying the property need not be considered, though ably briefed by counsel for appellee. The evident purpose and legal effect was to transfer the community interest of the appellee to the appellant.

The sole question is whether or not the court below erred in concluding as a matter of fact and law that the actions of the appellant in pursuading the appellee to have the land in question placed in her name, and thereafter abandoning appellee, nullified and vitiated the deed, and the appellant's counsel in their brief admit that the issue in this case being merely whether the deed made by the appellee to appellant was made by him under duress of fear of abandonment, and whether the appellant induced the appellee to make the deed fraudulently, with the intention of abandoning the appellee later. Able counsel for appellant claim that the deeds are absolutely controlling in this case, unless they are vitiated by fraud upon the part of the appellant as against the appellee, or unless the appellee executed said deeds under duress by reason of the threat of abandonment.

By statute in New Mexico, 1929 Comp. St. § 68-401, it is provided that, where real estate is conveyed to a married woman, the presumption is that title is thereby vested as her separate property. However, 1929 Comp. St. § 68-201, provides that either husband or wife may enter into any engagement or transaction with the other, or with any other person respecting property which either might, if unmarried; subject, in transactions between themselves, to the general rules of common law which control the actions of persons occupying confidential relations with each other.

An examination of the rules of the common law which control the actions of persons occupying confidential relations with each other as applicable to the case at bar, where the transaction is between husband and wife, we find the rule stated in Thompson on Real Property, as follows: "In equity an inquiry will be made into the motives, consideration, and objects to be accomplished by such conveyance. If the conveyance is from the wife to the husband, there may be a presumption against its validity on account of the confidential relation of husband and wife, and the supposed dominant influence of the husband;

but this presumption is overcome by proof that the wife received adequate consideration; that the conveyance was to her advantage, and was not obtained by duress or undue influence. When, however, the conveyance is from a husband to his wife, there is a presumption that it was intended for the wife's support, and is valid in equity, unless it was made in violation of the rights of creditors. While neither equity nor law denies the possibility of valid conveyances between husband and wife, yet whenever one of the parties obtains a possible benefit thereby, equity raises a presumption against its validity, and casts upon the one asserting it the burden of proving affirmatively his compliance with the equitable requisites in order to overcome the presumption." Thompson on Real Property, vol. 3, § 2823.

■■ That conveyances and other instruments may be set aside because procured by the exercise of undue influence upon the party executing them is not questioned, and the exercise of such undue influence does not necessarily mean the infliction or threat of any physical injury or mischief. In the general sense of the term, undue influence would seem to be a species of duress, or, if this be not quite accurate, the two would at least seem to run together so that the precise line where one begins and the other stops is not easily definable.

Thompson on Real Property says: "Relief may sometimes be had in equity against threats which do not amount to legal duress. Such relief may be granted when a deed has been fraudulently procured through the fears, affections, or sensibilities of the grantor excited by threats; as, for instance, where the grantor has made a conveyance in consequence of threats of a criminal prosecution of his brother. Equity will grant relief in such cases, though there would be no remedy at law. Cases of this kind, however, more properly come under the description of cases of undue influence, from which cases of duress are sometimes hardly to be distinguished. When the coercion is only a social or domestic force, and not a menace to life or limb or of imprisonment, it more properly comes under the designation of undue influence." Thompson on Real Property, vol. 3, § 2866.

A clear example of the application of the above rule is in an Indiana case, where the court said: "The threat of a husband to abandon his wife if she does not execute a mortgage on her separate real estate to secure his debt is an improper pressure; and a mortgage executed by a wife, under such a threat, may be avoided by her, if the threat induced the execution of the mortgage." Line, Administratrix, v. Blizzard et ux., 70 Ind. 23, at page 25.

Thompson on Real Property says: "The relation of husband and wife, though confidential, does not of itself warrant a presumption of undue influence. Such a presumption arises only when there is something suspicious in the circumstances, or the nature or magnitude of the gift is such that it ought not to have been made and accepted." Thompson on Real Property, vol. 3, § 2889.

Our court, speaking through Justice Bratton, has quoted with approval from Pomeroy's Equity Jurisprudence the equitable doctrine concerning undue influence, and states under what circumstances or transactions duress or undue influence may be inferred as the result of moral, social, or domestic force exerted upon a party so as to control the free action of his will, and when equity will extend relief, or a chancellor may be induced to set aside a conveyance of property made under such improper influences.

"Where there is no coercion amounting to duress, but a transaction is the result of a moral, social, or domestic force exerted upon a party, controlling the free action of his will, and preventing any true consent, equity may relieve against the transaction, on the ground of undue influence, even though there may be no invalidity at law. In the vast majority of instances undue influence naturally has a field to work upon in the condition or circumstance of the person influenced, which render him peculiarly susceptible and yielding—his dependent or fiduciary relation towards the one exerting the influence, his mental or physical weakness, his pecuniary necessities, his ignorance, lack of advice, and the like. All these circumstances, however, are incidental, and not essential. Where an antecedent fiduciary relation exists, a court of equity will presume confidence placed and influence exerted; where there is no such fiduciary relation, the confidence and influence must be proved by satisfactory extrinsic evidence; the rules of equity and the remedies which it bestows are exactly the same in each of these two cases. The doctrine of equity concerning undue influence is very broad, and is based upon principles of the highest morality. It reaches every case, and grants relief 'where influence is acquired and abused, or where confidence is reposed and betrayed.' It is specially active and searching in dealing with gifts, but is applied, when necessary, to conveyances, contracts, executory and executed, and wills." Cardenas et ux. v. Ortiz, 29 N. M. 633, at pages 641 and 642, 226 P. 418, 422.

The books abound with cases, and they are cited by counsel for appellant and appellee where conveyances have been set aside on grounds of fraud, undue influence, or duress; the theory upon which relief is granted in all such transactions being that equity implies a condition of superiority held by one of the parties over the other. Generally, the cases cited are where the husband obtained the property from the wife, where the guardian obtained property from the ward, where children obtained the property from the aged father or mother, the attorney from the client; generally the weaker or subservient having conveyed to the stronger or dominant, and equity has granted relief because of undue influence, duress, or fraud.

The rule under such circumstances has been well considered and expounded by our court in the case of Beals v. Ares, 25 N. M. 459, at page 501, et seq., 185 P. 780.

Here, however, we have the reverse, the clinging vine inducing the oak to convey to

her all his interest in fourteen thousand broad acres on the Pablo Montoya grant, the weaker sex importuning, "nagging," and obtaining from the stronger and dominating member of the life partnership a conveyance of community real estate. She adopted the device, as alleged by the appellee, of threatening abandonment of his bed and board, and dissolving the marriage by securing a divorce unless he gave her a deed to the ranch.

■■ The same strictness of construction as to what would constitute legal duress on the part of the husband does not apply against the wife by reason of their peculiar relationship. Wiley v. Prince, 21 Tex. 641; Kocourek v. Marak et al., 54 Tex. 201, 38 Am. Rep. 623. The affection, confidence, and gratitude which inspires the gift from a husband to a wife, being a natural and lawful influence, does not render the gift voidable, unless the influence has been so used as to confuse the judgment and control the will of the donor.

■ If the evidence in this case brings it clearly within the principles above stated, a court of equity will grant relief to the husband as against the wife, and, if the husband, who, because of his dominating position in the family relationship, has taken advantage of the weaker sex, cannot in equity hold that which he has acquired through fraud, duress, or undue influence, neither should the wife be permitted to hold that which she acquired through importunities, nagging, threats, and unfulfilled promises, if such importunities, nagging, threats, and unfulfilled promises

amount to a moral, social, or domestic force exerted upon the husband so as to control the free action of his will. If that be true, equity will extend relief, and a chancellor may be induced to set aside a conveyance of property made under such improper influence.

Tested by the general principles above laid down, and considering the voluminous briefs of counsel, and carefully considering a voluminous transcript, most of the matter therein contained being entirely immaterial to the issue presented for the consideration of this court, and clearing away the underbrush, we come to a clear consideration of the matters properly before us, as applicable to the issue.

We find from the evidence in the case at bar, the appellee, a surgeon apparently of high standing in his profession, a fellow of the American College of Surgeons, of exceptional standing in his community, who married the appellant when his gross earning capacity was nominal, and through his ability had acquired a fairly extensive surgical practice, moving in a social circle commensurate with his position in life; living according to his means and in a conservative manner providing for old age and adversity, accumulating through his earnings enough to obtain a fairly large ranch, approximately 14,000 acres, in New Mexico, of the approximate value of $60,000, which was paid for by the appellee out of his earnings, either in his profession or the subsequent earnings of the ranch. We find nothing in the record that would indicate the appellant brought anything to the community. The record shows

that the appellee provided the appellant with a comfortable home, servants, necessities, and luxuries of life; spent between $12,000 and $15,000 on the appellant to enable her to travel abroad.

The appellee testified, and from which the lower court must have found, that in the spring of 1927 the appellant had planned to again go to Europe, having been there once or twice before, and that she requested the appellee to make out his will, she planning to do likewise, and both instructed their attorney to make the wills, the appellee instructed the attorney to have the will provide that all his professional equipment and the outstanding professional accounts go to Dr. Henry Trigg, his brother and partner, and that all the personal property go to the appellant, also to give to the appellant a life interest in the appellee's community interest in the ranch, and the remainder over to his nephews and nieces, there being no children the issue of the marriage of appellant and appellee. Upon the announced intention of the appellee to make a will containing the above terms, the appellant became angry and threatened to get a divorce, whereupon the appellee instructed the attorney to change the terms of the will to give to the appellant all of the property upon his death; that thereafter, in May or June of the same year, the appellant requested that the appellee transfer the property in question to her to avoid possible loss of the same because of possible incumbrances or debts, though the record does not disclose that the property was incumbered in any way or that the appellee was in debt, and, upon appellee's failure or refusal to transfer the property in question, the appellant told the appellee that she was going to get a divorce, and left him and went to the home of her uncle, residing in the same city, Fort Worth, Tex., and that thereupon the said uncle called upon appellee and urged him to come to his home and talk it over with appellant and make up with appellant and drop the quarrel; that appellee did then go to the home of appellant's uncle that night, and there was again importuned by the appellant and her aunt to transfer the property to the appellant, to which importunities the appellee consented, and the appellant returned to the home of the appellee, and the transfer of the property was then made upon the instructions of the appellee to his attorney, Judge J. H. Barwise. The appellee testified that there was no intention on the part of either appellant or appellee to give the property outright to the appellant, or that the same should become her separate estate, that a few weeks after the transfer of said property the appellant left for New York, from which point she sailed for Europe, and that from the time of leaving during the month of August to the day of trial appellant and appellee have not lived together or cohabited as man and wife. The appellant remained in Europe until April, 1928, and going to the house of the appellee remained there about a week or 10 days, refusing to live with appellee as his wife, and told the appellee she was going to get a divorce. She refused to go with the appellee to the home which he provided for her and live with him as his wife. The appellee on

cross-examination testified that the appellant abandoned him without cause, refusing to occupy the same bed with him, that it was without reason, "just her temper and mad all the time, and she was displeased about something always, and the atmosphere she made, just made it impossible to have any affection, and she would lock her bedroom doors and if I attempted to caress or pet her, she would scream for the servants to come."

Appellee testified that he deemed it necessary to place the title in Mrs. Trigg, the appellant, to preserve his home and happiness, without any intention to vest the same in the appellant.

The evidence further shows that the first time the appellant claimed the property as her separate estate was after the filing of the suit under consideration.

From the testimony of J. H. Barwise, as disclosed by a deposition taken, wherein he was called as a witness by the appellant, he testified that there had been many discussions between appellant and appellee about a divorce, prior to the time of the execution of the deeds, and that appellant at times would claim she wanted a divorce and at other times that she did not want a divorce, but that the appellee's attitude during the various discussions had before the said witness Barwise was that Dr. Trigg did not want a divorce.

From the evidence it appears that the ranch was purchased May 1, 1920, and the appellee always paid taxes on the property out of community funds, as he supposed, for community property, and that, after the deed was

executed, the appellee continued his control over the the ranch, and there was no change in the managing of the ranch or financing the operations of it, and that the appellant has in no way attempted to interfere in the operation of the same by the appellee or his agents.

Witnesses on behalf of appellee testified that the appellant had stated to them that "she was tired of the appellee and couldn't stand him any more, and is going to get a divorce and going to Europe to get it, after she had all the property made over to her before leaving for France to get a divorce." Though the appellee had no knowledge of such statements prior to the execution of the deeds, it does show the appellant's undisclosed intentions to abandon the appellee after acquiring the property.

Appellant urges that the appellee gave the ranch to the appellant in lieu of a home, citing testimony of appellant and appellee to that effect; a careful examination of appellee's testimony, from which counsel for appellant urges such a conclusion, has reference to former repeated threats on the part of the appellant made to the appellee that she would get a divorce, at which times the appellee told her she could have the ranch in question, and that dozens of times, when the appellant would make such threats of divorce, appellee advised her that he would not stand in her way to make her happy, and would provide for her as well as he could by giving her a majority of his estate. However, the offer of a conveyance of the ranch as testified to by the appellee was in the event appellant secured a divorce, but nowhere does the record

disclose that the appellee prior to the conveyance of the ranch wanted a divorce, but on the contrary the appellee testified that he made the deed for the ranch to the appellant to prevent a divorce and abandonment, not in any manner intending to vest title in the appellant as her separate estate.

The case of Anderson v. Reed, 20 N. M. 202, 148 P. 502, L. R. A. 1916B, 862, might well be considered as somewhat analogous to the case at bar. The facts in that case are as follows: Joseph Z. Reed executed a will a few days before his death, in the early part of 1911, which will was duly probated. He had married the appellant Mary E. Reed in 1889, who lived with him as his wife for about 10 years, when she left him, whereupon he procured a divorce. During the year 1908 Mr. Reed was stricken with paralysis, which incapacitated him physically to some extent, but apparently did not affect his mental powers. In December, 1908, Mrs. Reed, who was residing in California, stopped at Tucumcari, N. M., where Reed lived, and stayed at his house for a short time with him, and then both left for El Paso, Tex., and remained there for some 3 or 4 months. From El Paso, Mr. Reed returned to Tucumcari, while Mrs. Reed went to Kansas, and thereafter she returned to California. The following December, she again returned to Tucumcari and resided with him. A few days before Christmas, Reed called upon his attorney and requested him to prepare deeds, conveying to Mrs. Reed two parcels of real estate located in Tucumcari. The deeds were prepared, and as drawn recited a consideration of $1,000 and $200

respectively. The deeds were duly signed and acknowledged and duly recorded on January 12, 1910. On January 27, 1910, Reed caused the same attorney to prepare additional deeds, by which he conveyed all the remainder of his real estate to her, each deed reciting a stated amount of money as the consideration. These deeds were recorded some time in February and were delivered to Mrs. Reed. Within a month or 6 weeks after such deeds had been recorded and delivered, Mrs. Reed left Tucumcari and Mr. Reed's home, and returned to California, where she remained until the following September or October, when she returned to Tucumcari, and remained for a few days, staying at the hotel in Tucumcari. Joseph Z. Reed had instituted action in the district court of Quay county to set aside the deeds, alleging that the deeds were executed and delivered to Mrs. Reed in consideration of her promise and agreement to live with, care for, and nurse him as long as he should live; that she had left him soon after the execution of said deeds, and had remained away continuously, and had failed to comply with her said agreement, and prayed for cancellation. In her answer Mrs. Reed denied that the consideration for said deeds was as stated in the complaint, and alleged that the consideration was the payment of an old note which Mr. Reed had executed to her some 10 or 15 years before in the sum of $9,500. Before the cause was tried, Mr. Reed died, and the suit was carried on by the legatees under his will, praying to set aside the deeds and to quiet title in the legatees.

The lower court found the issues in favor of the legatees and the deeds were ordered canceled and title to the property was quieted in the legatees. An appeal was prosecuted to this court, and the decree of the district court was affirmed. In that case we said:

"But the courts of this country, with but few exceptions, treat contracts by a grantee to furnish a home for and support to a grantor, when constituting the consideration for a conveyance by the grantor of the whole or major portion of his property, as being in a class by themselves, which are not governed by the ordinary rules which apply in the construction of contracts. While the agreement, which constituted the consideration for the conveyance in the present case, was not for support, being for companionship, care, and nursing, yet it is so nearly akin to those contracts for support, so often before the courts, that it must be placed in the same class, and is accordingly governed by the principles applicable in such cases. The value of the services, care, and attention contracted for cannot be measured in money. In this case, while others might have administered to the necessities of the grantor, in caring for and nursing him, they could not give to him that which he understood he was contracting for, viz., the care and nursing by one upon whom, if the witnesses are to be believed, he bestowed his love and affection and believed that he was receiving in return, and would continue to receive, daily evidences of similar devotion and affection, the loss of which, and her ministrations to his wants, could not be supplied by others, or its loss measured in money, as stated. Such a consideration as the above is not regarded as an ordinary obligation, but is of a peculiar character, imposing upon the grantee burdens which must be performed, if he would retain the benefits of the contract. Courts of equity, because of the inadequacy of any legal remedy, do not hesitate to set aside such contracts, upon proof of failure to perform by the grantee. Such courts are not so much concerned as to the proper theory upon which such contracts may be avoided, as they are that they must be set aside in order to prevent grave injustice and the imposition upon aged people, by unscrupulous persons, who pretend love, devotion, and friendship, where no one of such elements exists. Cancellation is the only adequate remedy applicable to such a case, where there is a refusal or intentional failure to perform. * * *

"As stated, contracts like the one now under consideration stand alone, and are not subject to the ordinary rules applied by courts in other cases. The necessity of avoiding such contracts, in cases where there is an intentional and inexcusable failure to perform by the grantee, in order to do justice, is so paramount, and cancellation being the only adequate and complete remedy in such a case, the court will give the remedy upon any reasonable theory. In other words the court in such a case, upon intentional and inexcusable failure to perform such a contract, will decree cancellation without much regard to or consideration of the theory upon which such cancellation is sought. This being true, this court will uphold cancellation in such cases where the complaint proceeds upon any reasonable

theory. The theory of fraud, in the inception of the contract, in such a case will support a decree of cancellation, where there is an inexcusable and intentional failure to perform, and the facts in the case show that the grantee never intended to perform the contract which the court found she entered into." Anderson v. Reed, 20 N. M. 202, at pages 214, 215, 216 and 217, 148 P. 502, 505, L. R. A. 1916B, 862.

██ Domestic tranquillity, the companionship and affection of a companionable mate and a peaceful household are more priceless than jewels, and cannot be measured in dollars and cents, and a social or domestic force exercised in such a manner as might put fear into the mind of a husband that, unless a conveyance is made of property so as to vest the same in the wife, a divorce would follow, with the consequences attendant thereto upon the domestic and social affairs of the threatened husband, might be considered as such undue influence and force as preventing the true and free action of his will and consent, and, where a deed of conveyance has been made after persistent "nagging," followed by threats of divorce and abandonment unless the deed is executed, it is a legitimate inference that such deed was made under the exercise of a domestic or social force which prevented the free action of the will of the donor and that such gift was made as the result of undue influence, and, if such gift be made in consideration of the fraudulent promise of a wife to return home and live with the grantor as his wife, and such promise is not fulfilled, it will amount to fraud.

The appellant's counsel contends that the apparent theory of the appellee upon which he seeks equitable relief is that the appellant through constant importunities and "nagging" secured a conveyance of the ranch, and that such constant importunities and "nagging" do not amount to deceit or fraud.

██ Constant importunities and "nagging" amount to an undue influence which can overcome the mind of the strongest willed person, and such constant importuning and "nagging" does amount to an undue influence.

██ Apparently the lower court could infer from the testimony that the appellant had persistently urged the appellee to convey to her the ranch, and he had become weary, troubled, and irritated in his mind by such persistent urging. Such persistent urging amounts to "nagging," and "nagging" is the exercise of a domestic force by which the mind becomes irritated, disturbed, ruffled, wearied, and troubled, so that the judgment may become confused and the free action of the will is out of normal control, and a chancellor can set aside a conveyance of property made under such improper conditions.

Though the term "nagging" is of doubtful origin, and may not have been known at the common law, it has been judicially and well defined, and has come to have a definite meaning through usage.

We find the definition applied in a Texas case, which is in point here: "In suit to set aside probate of will for undue influence, testimony as to testatrix's statements that husband was nagging her, trying to make her

sign will, but that, if she did so, she would be out of her right mind, held competent, since 'nagged' implies that person has been irritated by persistent urging, disturbed, wearied, troubled, or ruffled in mind. Buchanan v. Davis (Tex. Com. App.) 12 S.W.(2d) 978, 982." Words and Phrases, Fourth Series, vol. 2, p. 748.

The appellant also contends that the appellee knew, and had known for a long time, that the appellant was unhappy with him, and would sooner or later get a divorce, and that he executed the deed with his eyes open. But was the judgment and consent of the appellee the day he executed the deed free and not blinded? Though his eyes may have been open, it apparently was the constant importunities and "nagging" to convey the property that, coupled with his hope and desire to have a happy home and prevent a divorce, caused him to make the conveyance. If she was unhappy with him and he knew of it, and she conveyed to him the thought that she would be happy with him and would not secure a divorce or abandon him if he transferred the ranch to her, and he did transfer the ranch to her, and she did abandon him after such transfer, is that not a species of fraud and deceit?

Upon any reasonable theory, as our court has said in the case of Anderson v. Reed, supra, upon which relief will be granted in equity, whether the conveyance was the result of undue influence, fraud, or deceit, equity will step in and grant relief.

The appellant also contends that the theory upon which the appellee sought relief to cancel the deeds in question is not clear, in that there are no allegations or proof that the appellee was under duress or undue influence, or that he executed, or was influenced to execute, the deeds by the threats of the appellant to abandon him, and that the findings of the court that the appellant urged and persuaded the appellee to cause a deed to be made to her, placing the property in her name, and threatening to abandon him if he did not do so, were error. We have held in the case of Anderson v. Reed, supra, and rightly, that this court in a case as presented there and here will, upon intentional and inexcusable failure to perform, decree cancellation without much regard to or consideration of the theory upon which such cancellation is sought. This court will uphold cancellation in such cases where the complaint proceeds upon any reasonable theory. The theory of fraud, in the inception of the contract, in such a case will support a decree of cancellation, where there is an inexcusable and intentional failure to perform, and the facts upon which the lower court made its findings in this case show that the appellant intended to secure the property in her name and then abandon the appellee. The appellant pretended love and affection where none existed; she wanted the ranch and got it; he wanted a home and happiness, and did not get it. The trial court was warranted in finding that the appellant had acquired such conveyance through fraud. From a careful review of the

whole record, we think there are sufficient circumstances in the record to warrant this finding.

■ All of the appellant's actions and words while occupying a position as the wife of appellee and through the means employed amount to a domestic or social force intended to overcome and control the will of the appellee and, though the intent is not susceptible of direct proof, it must be concluded from the facts and circumstances proven. Where facts and circumstances are proven, from which an inference, conclusion, or deduction can be and is drawn by the trial court, such a finding will not be disturbed on appeal. Martinez v. Floersheim Mercantile Co. et al., 27 N. M. 245, 199 P. 905.

Our court has also said in the case of Cardenas et ux. v. Ortiz, supra, in 29 N. M. at page 638, 226 P. 418, 420, a case in point: "This rule is particularly applicable to a case of this kind, because the exercise of undue influence in order to secure something of value from the person or persons so influenced is but a species of fraud, and it has been well said by this court that fraud is properly made out by marshalling the facts and circumstances surrounding a given transaction, and deducing therefrom a fraudulent purpose or design where such manifestly appears."

Though the appellant in this case did not in so many words say to her husband, "You either give me the ranch or I shall desert, abandon and divorce you," nor did the appellee say to the appellant in clear terms, "I give you this ranch upon condition that you do not abandon, desert and divorce me, but that you stay home and make me happy," the court below evidently found by marshaling the facts and circumstances surrounding the transaction that the property conveyed was the result of the exercise by the appellant over the appellee of a moral, domestic, or social force, which confused his judgment and prevented the free exercise of appellee's will.

■ The findings of the trial court in this case on either theory, whether the conveyance was the result of undue influence, or obtained by the appellant from appellee fraudulently, are clearly against the appellant, and such findings, being supported by substantial evidence, will not be disturbed on appeal.

Finding no error, the judgment of the district court is affirmed, and it is so ordered.

WATSON, C. J., and SADLER, HUDSPETH, and BICKLEY, JJ., concur.