242 P.2d 495

## HUSTON v. HUSTON.
### No. 5415.

Supreme Court of New Mexico.
March 18, 1952.

L. George Schubert, Hobbs, for appellant.

Heidel & Swarthout, Lovington, for appellee.

SADLER, Justice.

This is an appeal by the wife, the plaintiff below, from a decree of divorce in which property rights of the parties were settled and an award of alimony in favor of the wife was made. The husband applied for and was granted a cross-appeal. It may seem strange that the wife who sued for and was granted a divorce should feel aggrieved by the decree awarding it and equally so that the husband as an appellee should complain of the decree sufficiently in his favor to be placed in the position of defending it before us as an appellee on his wife's appeal. This seemingly anomalous situation is clarified when it is noted that each party accepts the decree only in

so far as it is favorable and assails it to the extent that it is unfavorable.

The parties had been married about three and one-half years at the time suit for divorce was filed by the wife and nearly four years when the decree of divorce actually was entered. It represented the third marriage for each party, as to each the prior marriages being dissolved by divorce. There were no children born of this marriage. The divorce was granted on the ground of cruelty toward the wife by the husband. He does not challenge the decree in so far as it awards a divorce although he contested plaintiff's right thereto and himself by cross-bill sought a divorce on the ground of incompatibility.

Thus it is that the real controversy between the parties stems, not from any dissatisfaction with the award made under the primary relief sought in the complaint filed, but rather from the action of the court in awarding alimony and in the settlement made of property rights. It is well to state at the outset that there was no community property. However, about seven and one-half months after the marriage, the defendant's father made him and his wife a gift by deed of a residence property in Hobbs, New Mexico, consisting of a house and four lots on which the house stands. It was valued at $9,000. The son and his wife took title thereto as cotenants. The defendant's father having died intestate in the meantime, the son as his sole heir inherited $23,000 in cash as well as some cattle which he sold for $4,000, making a total of $27,-000 received by defendant from his father's estate.

Soon after the marriage of the parties, the defendant became a chronic alcoholic and by reason thereof he was irresponsible and helpless in the transaction of business. Largely as a result of this condition, he began a course of wild and reckless spending after coming into possession of the $27,000 inherited from his father's estate. However, apparently realizing his infirmity when drinking excessively, soon after receiving his inheritance he delivered $6,000 thereof to his wife, the plaintiff, and also executed and delivered to her a quitclaim deed to the residence property in Hobbs.

It was not the intention of either party to the deed that it should convey to the wife the husband's beneficial interest in the property conveyed, or to alter the actual ownership of the undivided interest of each theretofore existing in the property. On the contrary, the parties well understood that the purpose of the deed was to protect both of them in the continued ownership of the property as a home against the hazards of defendant's reckless expenditures when drinking, thus carrying out the true reason of the father for naming the son and wife as cotenants in the father's deed of gift.

The excessive drinking of defendant and his consequent cruelty to her kept plaintiff

under a constant strain and tension, resulting in such an impairment of her health that she was no longer able to work. She continued to occupy the home in Hobbs. There were three children born of the first marriage entered into by plaintiff. This marriage took place in 1926 and the second in 1941. There were no children born of either the plaintiff's second marriage or, as already noted, of the third to defendant. Nor were there any children born of defendent's two prior marriages.

Up to the time of trial, the plaintiff had expended all of the $6,000 which the defendant had turned over to her from his father's estate, except $2,034.57 still in her possession, upon living expenses of the parties, repairs on the house they occupied and the purchase of furniture and fixtures for the home. Accordingly, the trial court found and concluded that, by reason of the condition of plaintiff's health and until the further order of the court, the home of the parties with the furniture and fixtures therein should be set over to the exclusive use and benefit of the plaintiff; also, that as permanent alimony she should be awarded a full one-half of that portion of the $6,000 already mentioned as having been delivered to her by defendant from his father's estate which she had invested in improvements and repairs as well as in the purchase of furniture and fixtures; and, also, until further ordered, that she should have as additional alimony the sum of $100 per month payable on the 15th day of each month beginning June 15, 1950, plus all rentals from the rented portion of the residence property mentioned which was producing $60 per month at time of trial, as shown by the testimony.

The trial court further found and concluded that, as security for payment of the $100 per month alimony mentioned, the plaintiff should be authorized to retain the $2,034.57 remaining with her from the $6,000 turned over to her by defendant, as aforesaid, and to apply $100 of same to the satisfaction of any monthly installment of alimony as to which the defendant defaulted, making due account of same to the court.

There was also a Studebaker automobile belonging to defendant which he had taken from plaintiff's possession by an action in replevin and the court found it should be awarded to him and his right to possession confirmed. And fearing that defendant's drinking habits, in view of joint ownership of the property, might result in him visiting the home to her discomfiture, the court concluded he should be enjoined from visiting the premises and annoying her. The court also found and concluded the the plaintiff was entitled to an award of $350 attorney's fees which she was authorized to pay from the $2,034.57 of separate funds retained by her.

A decree was entered substantially in conformity with the findings, undisputed

facts and conclusions recited hereinabove. Specifically, the plaintiff 'was granted an absolute divorce from defendant. The parties were decreed to own as cotenants, each an undivided one-half interest in Lots 1, 2, 3 and 4, Block 23, all Hobbs Addition to the City of Hobbs, Lea County, New Mexico, being the residence property above mentioned, known also as 206 North 4th Street in the city of Hobbs, with all improvements thereon and the defendant's one-half interest was set aside, until further order of the court, to the exclusive use and benefit of plaintiff. The alimony award of $100.00 per month plus rentals mentioned, and attorney's fees in sum of $350 all were decreed in plaintiff's favor with authority in her to retain the sum already mentioned of $2,034.57 of defendant's separate property and to apply it as authorized to the alimony and attorney's fees allowed, together with costs and disbursements of the action. As stated above, the plaintiff appealed and the defendant cross-appealed from the decree so entered.

 The plaintiff's grievance against the decree rests primarily on the trial court's failure to find and hold that the defendant made a gift of the $6,000 turned over to her from his father's estate and of his undivided one-half interest in the real estate and improvements when he made a quitclaim deed to her of such interest. Whether he did so in either case is a question of fact and we have no disposition to disturb the trial court's findings on the issue.

Within a year following the marriage, the defendant began to drink heavily and upon coming into his father's estate began to spend and dissipate it with shameful prodigality and lavishness. Both as to the $6,000 turned over to her by defendant and in the case of the quitclaim deed he made in her favor, the court was fully justified in inferring that he was simply taking advantage of periods of sobriety to place that much cash and the undivided one-half interest in real estate beyond his own power to throw or give it away while on a drunken spree. Any argument on the question whether defendant knew what he was doing when he gave the deed is beside the point and deals with a false issue. Nobody, not even the defendant, ever questioned that he was fully competent to contract when he made the deed as well as when he turned over the $6,000.00 to plaintiff.

To contend the evidence does not suffice to uphold the trial court's finding on the crucial issue of whether the deed was intended as an outright gift, or merely to protect the parties, is to ignore material portions of it. Note this testimony by defendant, to-wit:

"Q. Just why were you going to place it in her name? A. So I could not mortgage or sell or dispose of it and I would always have a home.

"Q. Was she concerned you might dispose of your interest in the property? A. Yes, sir."

Also, this from defendant:

"Q. Did you ever tell your wife that you were giving her the home outright, that you would not have any more interest in it? A. No, sir.

"Q. Did you discuss that with her, you would still have an interest in it? A. Yes, sir, that I would still have an interest.

"Q. Did you discuss the general purpose of why you were giving that deed to her? A. Yes, sir, just like I said, so I could not mortgage or dispose of it.

"Q. And you talked to her about that? A. Yes, sir."

A friend of the family living near Hobbs at whose home the plaintiff visited about a year before the trial while trouble between her and the defendant was taking place, one H. C. Wiley, gave testimony corroborative of defendant's statement of the reason for making the conveyance. He testified:

"Q. Relate in your own words generally what she said out there at that time? A. Well, she came out there one morning, I imagined between nine and ten o'clock, and she said she was still having trouble; I called her by name, I said 'Well, Lavera, what is it', and she said, 'Well, D. N. is gone again', and I said, 'Lavera, what are you going to do, why do you not quit him', and she said, 'Sam, I am not about to quit him,'. She said, 'I have it all to gain and nothing to lose'. I said, 'Well, I guess that is a good way to look at it'.

"Q. Was there anything said about title to the home down in Hobbs? A. Well, not as I can recall, only Lavera said, 'Sam, I think if I can, I should get D. N. to sign me over his part of the home if anything comes up in the way of a mortgage where it could be mortgaged and I would lose my part of it', and I told her this, 'Lavera, that might be a good way to look at it'. I do not know anything about the domestic affairs. As far as I recall that was all that was mentioned.

"Q. But she said out there she was going to try to get him to give her a deed to the property? A. Well, that is what she said.

"Q. And she was afraid he might sell his interest? A. That is what she said."

To be sure, there is some testimony tending to support the plaintiff's theory of a gift to counteract the testimony adduced by the defendant supporting the findings. That the testimony is conflicting is admitted. But on a challenge like this all conflicts in the testimony are to be resolved in support of the findings and the testimony as a whole is to be viewed in the aspect most favorable to them. Hedrick v.

Jagger, 46 N.M. 379, 129 P.2d 340; Keil v. Wilson, 47 N.M. 43, 133 P.2d 705, 148 A.L. R. 397. And where the evidence supports the decree, although conflicting, it will not be disturbed on appeal. Grissom v. Grissom, 25 N.M. 518, 185 P. 64. There can be no doubt but that the findings in this case support the decree. Furthermore, a careful review shows evidence supporting them meets every requirement of the rule as to sufficiency to establish defendant as the owner of an undivided one-half interest in the real estate in question. Cf. Walters v. Walters, 26 N.M. 22, 188 P. 1105; Evans v. Evans, 44 N.M. 223, 101 P.2d 179.

On his cross-appeal the defendant complains of the award of $100 per month alimony and of the injunction which restrains him from going on the premises occupied by plaintiff and annoying her. We see no abuse of discretion in either case. The court merely allows the alimony "until further ordered." Upon a showing of hardship incident to any substantial change in financial condition on defendant's part, no doubt the trial court will make such change in this award as altered conditions justify, on proper application. It may seem somewhat harsh to deny by injunctive order the right in defendant to visit premises in which he is held to own an undivided one-half interest. But here, too, the continuing jurisdiction retained by the court incident to the alimony award may likewise be invoked to ameliorate any hardship in the injunction against defendant, upon proper showing.

Finding no error, the decree appealed from will be affirmed.

It is so ordered.

McGHEE and COORS, JJ., concur.

LUJAN, C. J., and COMPTON, J., dissenting.

LUJAN, Chief Justice (dissenting).

I am unable to concur in the foregoing opinion so far as it holds that because of excessive use of intoxicating liquors the defendant was irresponsible and helpless in the transaction of business; and that it was not his intention to convey to his wife his interest in the property conveyed.

The court found that the defendant was a chronic alcoholic; and because of excessive drinking and habitual condition of drunkenness, he was irresponsible and helpless in the transaction of business; but I look in vain in this record for evidence to sustain that part of the finding "that the defendant was irresponsible and helpless in the transaction of business." The defendant had been addicted, for years, to the use of intoxicating liquors; but, I cannot say, as a rule of law, that because a man is a drunk-

ard, therefore, he is of unsound mind. The Court had no evidence whatever before it as to the effect his intemperate habits had upon his mental capacity to transact business.

In 26 C.J.S. § 54(f), under Deeds the rule is laid down thusly: "The fact that a grantor is an habitual drunkard will not render him incompetent to execute a deed as matter of law, and, *in the absence of proof of mental incapacity* resulting from his intemperate habits, the deed of an habitual drunkard may be upheld where it was executed during a sober interval; * * *. However, where the grantor was not under the influence of liquor when he executed the deed, evidence of frequent use of alcohol by him does not invalidate the deed, unless his mind was weakened so as to render him incapable of intelligently entering into the contract." (Emphasis mine.) Also, see, 18 C.J. page 223, note 97(a).

The test is: Did the defendant have sufficient mental capacity to understand the nature of the particular transaction, and with such understanding voluntarily enter into and consummate the same? Answered in the affirmative, mental capacity is established so far as this particular contention is concerned.

There was evidence of the frequent use of intoxicating liquors by the defendant during a period of two years. There was no evidence whatever in the record tending to show that the mind of the defendant was weakened by his use of intoxicating liquors so as to render him incapable of intelligently transacting business. The defendant testified positively that he was sober on the day he signed the deed conveying his interest in the property to his wife.

In 17 Am. & Eng.Ency.Law, page 401, we find this language: "Where a person seeks to avoid responsibility for a contract on the ground of intoxication alone, it must appear that the drunkenness was so excessive that he was utterly deprived of the use of his reason and understanding and was altogether incapable of knowing the effect what he was doing. Any degree of intoxication which falls short of this will furnish no ground for release in the absence of fraud on the part of the other contracting party."

Tested by the general principles above laid down I am strongly inclined to the view that the facts do not bring the defendant within its application. Considering everything that was done and said by him at the time he executed the deed and his condition prior thereto, I should hesitate before deciding that he was in such mental condition that he did not understand the effect of the deed of that day. Defendant drank no intoxicating liquors during that day. Nothing is shown in his conduct

or by his words indicating that degree of incapacity that will avoid the deed. He did not show in any way that he was not in his normal mental condition. There is absolutely nothing in the record to show that defendant was dethroned of his reason, or that his understanding was so impaired as to render him mentally unsound when the deed was signed. If he was competent, this court cannot concern itself whether he made a good or bad deal, or what he did or had done with his property.

The court also found "That the quit claim deed executed and delivered by the defendant to the plaintiff was not a gift; but that the deed was made and delivered for the protection of both parties and to prevent the defendant from disposing of or encumbering his interest in the premises when he *might be irresponsible by* reason of his habitual intoxication." (Emphasis mine.)

At the time the deed was prepared, in the law office of reputable attorneys, nothing whatever was said or intimated as to defendant's *secret intention* and apparently no one in the world knew or heard of it. It would have been very easy for the attorneys to draw a deed incorporating his so-called intention had he so advised them. He told no one of this intention until approximately eleven months after the deed was signed and delivered to the plaintiff.

The intention must be gathered from the language used in the deed and not from what the grantor may have intended to do. In Westover v. Harris, 47 N.M. 112, 137 P.2d 771, 774, this court said: "Deeds are clothed with too much solemnity and finality to be lightly interpreted contrary to the clear language thereof upon conflicting evidence as to the *intention* with which they were executed." (Emphasis mine.)

And in Antley v. Antley, 132 S.C. 306, 128 S.E. 31, 32, the court said: "One of the first canons of construction is that the *intention* of the grantor must be ascertained and effectuated if no settled rule of law be contravened. But *intention* is a term of art, signifying the meaning of the writing. Sandford v. Sandford, 106 S.C. [304] 306, 91 S.E. 294. *Intention* does not mean the purpose of the grantor *apart from the writing.* As has been said, the intention of the grantor must be *found within* the 'four corners' of the deed." (Emphasis mine.)

The majority say that it was not the intention of either party to the deed that it should convey to the wife the husband's beneficial interest in the property conveyed, or to alter the actual ownership of the undivided interest of each theretofore existing in the property; that on the contrary, the parties well understood that the purpose of the deed was to protect both of them in the continued ownership of the property. However, this contention is not supported

by the evidence. On this point the evidence of the plaintiff and defendant was diametrically opposed. The defendant said, it was his intention to convey the property to the plaintiff so that he could not sell, mortgage or dispose of the same. That he and the plaintiff talked the matter over but he does not remember who suggested the transfer. The plaintiff says in relation to the conversation: "Well, the subject was talked but I would not say I told him I wanted it; when it was discussed I said it was a matter of choice with him, it was up to him and made no difference to me, and he said 'that is what he wanted to do.' Well, when we talked about remodeling and repairing the house, it had not been papered or cleaned up since we had been there and sometime before, and when I tried to discuss the matter with him about getting his opinion about fixing it, and he said '*I have no interest in that, it is yours,* and go fix it like you want to, it will be all right with me.' "

She was corroborated by Mr. G. P. McCrary, a carpenter and builder who testified that he remodeled the house. Then he said "I asked him (defendant) several times what he wanted to do about this and he said 'well, go see my wife, she is the one that lives there and *it belongs to her.*' "

In Carberry v. Carberry, 137 N.J.Eq. 9, 43 A.2d 215, 216, the court said: "Perhaps the suggestion might be put forth that the complainant in executing the deed of conveyance relinquished his inchoate expectancy of an estate by the curtesy in the premises. The evidence, however, does not satisfactorily disclose a bargain achieved by any such a consideration. In undertaking to buy the property, the defendant Richardson first interviewed the complainant, who stated: '*See my wife, its her property, its not mine.*' The complainant appears to have graciously signed the deed without any intimation to anyone that any portion of the proceeds of the sale or other consideration was to be payable or forthcoming to him. When it became evident that the parties could not set at ease their matrimonial agitations, the complainant resolved to organize his present claim." (Emphasis mine.)

The placing of the title in the name of the plaintiff, was, I believe intended by the defendant as a gift to his wife. Such is the presumption of law and in absence of clear, definite, trustworthy and convincing proof of a contrary intention the presumption prevails. The testimony of the defendant that he did not intend to make a gift to the plaintiff does not meet the required standard of proof. In Trigg v. Trigg, 37 N.M. 296, 300, 22 P.2d 119, 121, we said: "* * * When, however, the conveyance is from a husband to his wife, there is a presumption that it was intended for

the wife's support, and is valid in equity, unless it was made in violation of the rights of creditors."

In Andreas v. Andreas, 84 N.J.Eq. 375, 94 A. 415, 416, the court said: "It is the well-settled rule in this state that where a husband transfers either real or personal property to his wife, it will be presumed that the conveyance and transfer were intended to be by way of voluntary settlement upon her. This, however, is a rebuttable presumption, and the deed having once been made and delivered by which title is vested in her, the burden of proof is on him to establish a different result. *And it may be said at this point that where there is conflicting evidence as to a husband's object in making a conveyance of lands to his wife, the ordinary presumption that it is intended as a provision or settlement for her benefit is not rebutted.* Linker v. Linker, 32 N.J.Eq., 174. Therefore if on a balancing of the testimony it should be found that the husband has not met the burden of proof, his application to the court must fail. The proceeding must be judged by what took place at the time of the execution and delivery of the deeds, and not by circumstances which occurred afterwards." (Emphasis mine.)

And in Strong v. Strong, 134 N.J.Eq. 513, 36 A.2d 410, 413, the court said:

"* * * Assuredly there are transactions between strangers in which the payment of the consideration for the conveyance draws to it a presumption of the beneficial ownership, but where the parties are attached by the relationship of husband and wife and the husband pays the consideration of the purchase of lands and has the conveyance made to his wife, the presumption is that a gift or settlement was intended. The presumption does not command conclusive effectiveness. It may be demolished by definite, trustworthy and convincing proof of a contrary intention. Yet, where the wife's title is evidenced by a duly executed and recorded deed made at the express request of the husband which declares by its terms that she is to hold the premises for her own exclusive use, public policy concerned with the stability of titles also recommends that the apparent authenticity and efficiency of the deed should not be diversified except upon satisfactory and explicit proof of a contemporaneous intention inconsistent with the grant manifestly exhibited by the deed.

"* * * He sought to tranquilize her apprehensions by providing her with a comfortable home and the title to the property. Other inducements of a gratifying character were probably also considered. The presumption that it was the intention of Mr. Strong to voluntarily bestow the absolute

and beneficial title to the premises upon his wife has not been repulsed by contradictory proof of the requisite degree of clarity and persuasiveness. Hence, the deed to her cannot justifiably be qualified as desired by the defendant Strong."

The requisite proof, as described by the cases, must in quality and character be, clear, definite, reliable, trustworthy and convincing, leaving no reasonable doubt of the intention of the parties. I am constrained to conclude that the testimony of the defendant, scrutinized in the light of the surrounding factual circumstances and in view of his own conduct, does not rise to the required standard of clear, definite, reliable, trustworthy and convincing proof.

In my opinion, the evidence offered by the defendant has failed to overcome the presumption of a gift or settlement.

Much as I may be inclined to yield to the above findings of the learned district Judge in a case of this character, I feel urged, after a careful examination of all the facts, to not only question the correctness of the above findings, but to hold that the facts proved do not possess sufficient probative force to sustain the judgment.

For the reasons cited, in my opinion, the judgment of the trial court should be reversed in this particular. The majority having concluded otherwise, I dissent.

COMPTON, J., concurs.