113 P.2d 171

## STATE v. HOLDEN.

No. 4551.

Supreme Court of New Mexico.

April 28, 1941.

E. E. Young, of Roswell, for appellant.

Filo M. Sedillo, Atty. Gen., and Fred J. Federici, Asst. Atty. Gen., for appellees.

SADLER, Justice.

The defendant by information was charged with mingling poison, to-wit, arsenic, with food with intent to injure and kill one Ernest Langenegger, contrary to the provisions of 1929 Comp., § 35-603. The jury returned a verdict of guilty at the conclusion of the trial and the court imposed on defendant the mandatory sentence of life imprisonment from which he appeals.

The evidence connecting defendant with the crime is entirely circumstantial and his principal assignment of error is that the verdict is without substantial support in the evidence. The fact that Ernest Langenegger as well as other members of his family suffered intermittently from arsenate of lead poisoning over a period of approximately three months is not questioned. Indeed, it was stipulated at the trial that competent physicians found them suffering from repeated doses of the poison mentioned. The challenge against the verdict, then, is not that proof of the corpus delicti is wanting, but rather that the circumstances relied upon to connect defendant with commission of the offense lack the

probative force required in criminal prosecutions.

The following facts given in evidence either are undisputed or within the verdict as permissible inferences. The prosecuting witness was an irrigation farmer living in the vicinity of Hagerman in Chaves County, New Mexico. His family consisted of himself, his wife to whom he was married in 1929, following the death of his first wife, and also four sons by the first marriage, all residing together in the farm home at the time of the events to be related. In addition, there were two daughters by the former marriage who were no longer residing with their father. The father, the prosecuting witness, at the time in question, operated two farms, one surrounding the house occupied by the family as a home, and another located some four or five miles distant therefrom, northwest of the town of Hagerman.

The defendant had worked for Langenegger as a farm laborer at different times beginning eight years prior to the trial. In the month of January, 1937, however, he began working steadily for him and continued in his employ until early September of said year, living at a small cabin on the upper place but alternating his work between the two farms.

From time to time between June 15 and September 2, 1937, Ernest Langenegger, the prosecuting witness, and other members of his family became violently ill from eating food prepared in the Langenegger home, particularly biscuits, pastries or other foods in which flour was an ingredient. Symptomatic of the illness suffered by them were thirstiness, cramps, nausea and vomiting. Such symptoms usually accompany arsenic poisoning. Specimens of flour taken from the flour bin in the Langenegger home, from which bread and pies were baked, showed the presence of arsenic in sufficient quantities to have caused the symptoms displayed by members of the family.

After becoming suspicious of the flour, the bin was emptied into the back yard. The following morning between fifty and sixty sparrows and some chickens lay dead in the barn yard from eating the flour. For a time after emptying the flour bin the family bought pastries and bread and during this period the illnesses ceased. But, upon making a new purchase of flour and using it from the bin for making pastries and bread consumed by the family, members of the family began to display the same symptoms enumerated above. Shortly after the purchase of the new flour, Mrs. Ernest Langenegger, wife of the prosecuting witness, heard noises in the kitchen about the cabinet around midnight. The next morning upon being interrogated by Mrs. Langenegger regarding the matter, the defendant, who was irrigating on the night shift, admitted he was the one in the kitchen that night and explained his presence by saying he was making some tea.

Again, the defendant was discovered in the house around midnight by Ernest Langenegger. Upon being questioned as to his purpose there, he offered a fanciful story of having just shot a man who was one of a

group of three seemingly engaged in tampering with the irrigation pumps and stated that he had come to the house to get Langenegger's son, Bill, to come out and check the engines to ascertain if any damage had been done them by the culprits. He stated that the man he shot stumbled and fell, was picked up by his companions, placed in a car and that all three escaped. Investigation disclosed that the story was fabricated.

Jim Langenegger, a son of Ernest, was the first to get sick. The date was about June 15, 1937. He had breakfast at home that morning and lunch on the upper farm nearly five miles away. Jim consumed something that day that no other member of the family did. It was a cold drink known as Cool-ade which had been prepared by the defendant. The defendant himself drank Cool-ade with this son, apparently from the same making, though it was not out of reason that something might have been placed in the glass given Jim, not contained in his own. Jim became sick and displayed the same symptoms later shown by other members of the family. The defendant did not get sick from drinking the Cool-ade.

Other dates on which all or some members of the family became sick after eating were June 30th, about July 5th and around September 2nd, 1937. On June 30th, after eating breakfast at home, the entire family, except the son, Bill, got sick. He had eaten no biscuits for breakfast.

On July 4th, ice cream was made at the Langenegger home by Mrs. Langenegger and the defendant. Present also were Willis Jacobs, Jim Langenegger and Orville McCullough. The last three named ate some of the ice cream and two of them, Jacobs and McCullough, also ate some vanilla cake which had been baked by Mrs. Langenegger. Both got sick after eating the cake and vomited. The defendant ate none of the cake although he took some of it home with him. On another occasion and prior to members of the family becoming sick on June 30th, Mrs. Langenegger had baked three peach pies and a cake. This is the date on which the entire family except Bill, who ate no biscuits that morning, became sick after eating breakfast at which biscuits had been served. Ernest and his son, Jack, ate some of the pie for dinner at noon and Jim and Jack some for supper and became very sick. Bill who had said he thought the peaches in the pie were spoiled and refused to eat any did not get sick. The defendant, who was present in the Langenegger home, stated he didn't think there was anything wrong with the pie. He was asked to eat some of it but refused, simply saying he didn't want it but that he would take some of it home with him which he did. He ate none of it while at the Langenegger home.

Soon after defendant began working steadily for Ernest Langenegger, one Jim Hampton was employed to assist in the irrigation of crops. After some heated words one day between defendant and Hampton, the former was heard to remark that if Hampton ever returned to his place he would "hurt" him. When later Hampton did return and ate his lunch to which de-

fendant had access while Hampton was at work in the field, he got sick and suffered the same symptoms that other members of the Langenegger family had previously and later displayed.

On July 5th, Ross and Jim Langenegger got sick at the upper place after eating their lunch consisting of bread and canned goods which previously had been taken there from the home place and some milk taken up that morning. It was customary for them to place the milk in a container under the pump in order that it would be cool when they returned from their work in the field. It was so placed on this occasion. The pump was near defendant's cabin and although on the night shift and sleeping in the daytime he was often "seen up" at various times and had access to the food and milk.

When Jim got sick defendant said nothing at first. Then he suggested that Jim was poisoned and that he be taken to a doctor. When Ross got sick the defendant kept telling him that somebody was poisoning him and suggested the name of a neighbor as one who might be doing it on account of his having had to file a suit against Ernest Langenegger to get a well drilling permit, as stated by defendant. On one occasion defendant told Ross Langenegger he had read in a detective magazine that arsenic could poison a whole family—cripple them—and asked Ross if he thought that could be the trouble.

One day during this period Jack and his father, Ernest Langenegger, got sick at the upper place. Ernest got sick out in the field. He lay down in the field and vomited and then Jim came along and helped him to the house. He and his son Jack lay down on a cot together and defendant brought them two glasses of lemonade. The son, Jack, declined to drink his stating, "Daddy, there is something the matter with this lemonade". The father tasted his and said he was going to drink it. He did and in about two hours he "got lots sicker again".

After drinking the lemonade Ernest Langenegger went out by the pump house to bathe his face and feet in cold water. He was violently ill. He lay there for a couple of hours. Presently he turned over and Carl Holden, (the defendant), was standing back of him. Holden remarked: "Colonel (a name by which defendant often addressed the prosecuting witness), I thought you was dead." This was on June 30th.

Then, about September 2nd, the whole family, including Ernest Langenegger, got violently sick again. Mrs. Langenegger got sick first—then Jack and Jim. They had biscuits for breakfast that morning. The entire family went to El Paso for examination by physicians there and it was found that all of them were suffering from repeated doses of arsenate of lead poisoning as hereinabove stated. A day or two before departing and when Ernest Langenegger made known to defendant that they were going to El Paso to be examined for their illnesses, the latter remarked: "Ernest, I need a lawyer and a good one".

Once, during their illnesses, the defendant told Ernest Langenegger that the trouble was "the nerves"—Langenegger was insisting it was his muscles because he seemed partially paralyzed. Later, he learned that arsenic poisoning does affect the nerves. On an earlier occasion and in the fall of 1936, while conversing with Ernest Langenegger, the defendant remarked: "I don't know what's the matter with me but sometimes I want to hurt my friends."

There was a sack containing arsenate of lead located in the barn on the Langenegger home place. It was purchased in 1932 for use in spraying cotton. It had been used during that cropping season and what remained, about two pounds, at that time had been placed up over the door inside the barn and pushed down between a 2 x 4 and the door. The manes and tails of horses which were clipped from time to time and saved by the Langeneggers for making saddle cinches were placed over the sack and there were also two distributors from a Model A Ford on top of it. The defendant had never had occasion to know of the presence of this arsenate of lead on the place and so far as the Langeneggers knew had no knowledge of its presence there. It was more than seven feet above the ground and in order to ascertain contents of the sack one would have to stand up on a stool or box to examine it.

After learning in El Paso that they had been poisoned, Ernest Langenegger telephoned a druggist at Hagerman to proceed forthwith to his place and notify the three sons left behind (but who later followed their father to El Paso) not to use any soda, baking powder or sugar on the place, —in fact, not to use anything there. Carl Holden, the defendant, was in the corral taking care of the horses when the druggist arrived. He came over to help the druggist search for the baking powder and soda. They made a thorough search and were unable to find any of either, the reason being that Bill Langenegger, one of the sons who had left for El Paso with two of his brothers after his father's departure, had taken them with him for analysis there. Asked by the druggist whether he knew of anything around there that could have gotten into the food or baking powder, the defendant replied that "he knew of the arsenic that was in the garage". They then went to the garage or barn where defendant told the druggist "that was what was up there in the sack. It was back up close to the roof of the garage". At this time the defendant did not know he was suspected of having mixed the poison in food of the Langenegger's. The druggist testified: "We came in there looking at it. He said: 'It has the stuff on it. You can tell it hadn't been moved off in a long time.' I said, 'Yes, it showed it hadn't been disturbed in quite a piece'."

This statement of the defendant could be viewed by the jury either as an innocent and natural retort to the druggist's query whether he knew of anything around the place that could have gotten in the food; or, might have been given a sinister aspect as putting up barriers to resist an accusation not yet made against him.

The defendant was arrested on September 6th, following the return of the Langenegger family from El Paso. A search of defendant's cabin disclosed the presence of no poison or poisonous compound. After his arrest, when asked by the officers if he knew of any poison around the Langenegger home place, he immediately told them of the arsenate of lead in a sack over the barn door as hereinabove related and pointed it out to them. Quizzed by Ernest Langenegger as to how he had learned of its presence over the barn door, the defendant falsely replied that he had discovered it on the 4th of July when he went out to the barn to get the ice cream freezer. It was Jim Langenegger, Ernest's son, and Orville McCullough, who went to the barn and got the ice cream freezer while the defendant was mixing the ice cream in the kitchen. The ice cream freezer was not over the barn door but was in the corner on the ground directly under the sack of arsenate of lead, a little over seven feet above the ground.

Throughout the period when the prosecuting witness and other members of his family were suffering from these spells of sickness shown to have been due to the presence of arsenate of lead in the bread and pastries, if not in other articles of food or drink consumed by them, the defendant himself was never sick nor displayed any of the symptoms to which members of the Langenegger family were subject. He had declined on two different occasions to eat at the Langenegger home cake and pies baked there, although taking to his cabin a portion of each with the apparent purpose of eating same there later. While professing to have eaten it there, the same food which had made sick members of the Langenegger family who ate cuts of the pie, and Willis Jacobs and Orville McCullough who ate slices of the cake, had no such effect on the defendant himself if he ate it. The jury could and evidently did believe he declined to eat it because of a guilty knowledge of its contents.

The defendant was arrested on September 6, 1937, at the Langenegger home place, charged with having mixed arsenic in food with intent to injure and kill Ernest Langenegger. Under questioning by the officers he several times offered to plead guilty but always accompanied the offer by a profession of innocence. The officers quoted him as saying: "Well, I will plead guilty to it but I didn't do it". This same statement was made by defendant at different intervals throughout the questioning which continued altogether over a period of about fourteen hours broken by an intermission for supper.

On this evidence the jury returned a verdict of guilty. Viewed as a whole, we are unable to say it does not afford a substantial basis for the conclusion reached. Of course, it would leave all of us better satisfied if the evidence were stronger. Unfortunately for the feelings of those called upon in various capacities to assist in the administration of justice, however, those setting out to poison or slay do not publish in advance the time and means to

be employed in the commission of their crimes. On the other hand, they proceed in the utmost secrecy in the planning and perpetration of their diabolical schemes. It is only by putting together this and that fact and circumstances until they constitute a complete chain of evidence that a crime so conceived and executed can ever be established and the perpetrator brought to justice.

There were facts here before the jury, which believed, furnish such a chain of evidence. It is needless to repeat them all. That the opportunity existed, there can be no doubt. There was arsenate of lead in the barn in a secluded spot over a door up near the roof. Defendant had never been told of its presence there. Yet he discovered its presence somehow and when questioned after arrest as to when and how he did so, gave a false story of the circumstances. He admitted being in the kitchen of the Langenegger home at midnight, around the cabinet which contained the flour bin, offering as an excuse that he had come in from night irrigating to make himself some tea,—a good excuse or not as the jury might credit or disbelieve it. The second time, a little later when found in the Langenegger home at midnight and confronted suddenly with a demand for an explanation of his presence, he offered the lurid and fantastic story of having fired shots which no one heard and injured one of three culprits tinkering with the irrigation pumps and engines, found to be unmolested, and of their thrilling escape, taking away their supposedly injured companion with them. The jury could and evidently did discredit the entire story.

Cake and pastries which other members of the family ate and which made them sick the defendant refused to eat in their presence and apparently to avoid suspicion, took portions thereof away with him with the professed purpose of eating them there but was never sick so far as known. He himself suggested before the fact was known the Langeneggers were suffering from poison, that it might be arsenic and endeavored to cast suspicion on a neighbor by suggesting him as the guilty party due to difficulty over a well drilling permit.

There are other circumstances, but, finally, the defendant's own offer, made several times, to plead guilty, although professing innocence, was a matter peculiarly within the jury's province to appraise. In view of all the other circumstances, in reaching its verdict, it may have disregarded the assertion of innocence and have given significance only to the offer to plead guilty. Obviously, this is exactly what happened. The defendant's statement was not entirely exculpatory so as to bring it within the rule applied to one of the defendants in State v. Hernandez et al., 36 N.M. 35, 7 P.2d 930.

Within the rule announced in State v. Clements, 31 N.M. 620, 249 P. 1003, 1006, and applied to the defendant, Hernandez, in State v. Hernandez, supra, we are constrained to hold the evidence, although entirely circumstantial, affords substantial support for the verdict. In the Clements

case we quoted approvingly from 17 C.J. 267 (24 C.J.S., Criminal Law, § 1882), among other things, the following: "A verdict based on circumstantial evidence carries the same presumption of correctness as other verdicts, and will not be disturbed unless wholly unwarranted, even though the evidence is weak and unsatisfactory to the appellate court."

Having concluded that defendant's challenge to sufficiency of the evidence to sustain the verdict is not well taken, we proceed to a consideration of the remaining assignments. Some of them, indeed, the defendant's counsel expressly abandons in his reply brief due to controlling decisions presented by the state in its answer brief. These and some others of so little merit as not to require consideration will be passed without further notice.

First, it is claimed that the trial court committed error in permitting the prosecuting witness to testify to a disagreement between defendant and one Jim Hampton, of the former's threat to hurt Hampton if he ever came back to defendant's place, of Hampton's return to eat his lunch to which defendant had access during Hampton's absence while at work in the field, and of his becoming sick, vomiting and displaying the same symptoms later shown by the prosecuting witness and members of his family. The testimony complained of was already half related when the defendant's counsel interposed this objection.

"Mr. Young: I object to the introduction of this line of testimony for the reason it is immaterial, and improper, to detail something that occurred between a man named Hampton at some time and the defendant. It has nothing to do with the case.

"The Court: When did this occur? What date was it this occurrence happened?

"Witness: In March, 1937.

"The Court: Do you propose to show these symptoms then of arsenical poisoning?

"District Attorney: Yes sir.

"The Court: Overrule the objection.

"Mr. Young: Exception."

It will be noted that defendant objected to the admission of this testimony because claimed to be immaterial and improper to detail an incident occurring between the defendant and the third party. It was not subject to objection as hearsay since the witness related only what he personally observed and statements made by the defendant himself within the hearing of the witness. He was not permitted to relate any conversation with Hampton occurring out of the presence of the defendant. If relevant and not hearsay, it was competent to prove the incident by the prosecuting witness. The trial court was impressed with its relevancy when assured by the district attorney that the incident would disclose the same symptoms of arsenical poisoning in Hampton as in members of the witness' family, and no other objection being presented, admitted the testimony. Much of the defendant's argument

under this assignment is directed to the fact that Hampton himself was not introduced as a witness, an objection which we have just held is without merit.

It is further argued, however, that the witness was permitted to testify to an independent crime not within any of the recognized exceptions. Overlooking the fact that most of the testimony was in before defendant objected at all, an analysis of his objection does not disclose that he called to the trial court's attention while this testimony was coming in, the principal objection now urged against it, viz., that it is evidence of another crime. This question was not presented to and ruled upon by the district court, and, therefore, cannot be considered here. State v. Lord, 42 N.M. 638, 84 P.2d 80. Later in the trial the defendant moved to strike all of this testimony but no ground of objection to it was stated and, if stated, would have been too late. State v. Alford, 26 N.M. 1, 187 P. 720.

It is next complained that the trial court committed reversible error in permitting the witness, Bill Langenegger, to relate in evidence over an objection that it was "improper and immaterial" the incident where defendant, returning from basketball practice with witness, took a pistol from his trousers and when asked what he intended doing with it, referred to a previous accidental collision between the two on the basketball court in which defendant was rendered unconscious, and remarked: "Well, I will tell you, you hurt me, hurt me bad. I guess I won't be any good any more. I want you to shoot me and end it all". The witness said: "I laughed at him and sent him home. The incident was never mentioned again."

The defendant now urges the inadmissibility of this testimony as tending to show the commission of an independent offense. Just what offense it discloses, whether carrying a concealed weapon or an attempted assault with one, he does not say. Truly, it would be difficult to characterize what occurred as the latter offense. The difficulty with defendant's position is that he did not, either in his objection first made or in the later motion to strike, apprise the trial court that he was relying on the objection now urged. The trial court had no opportunity to consider admissibility of the testimony against the objection now urged. Hence, it is not before us for review. State v. Lord, supra.

The trial court was doubtful about the materiality or relevancy of this incident but let it in. We entertain the same doubt. If intended as supporting an implication of threatened harm to the son of the prosecuting witness, it is wholly without probative value and might even operate in defendant's favor. There was every opportunity to inflict harm if harm had been intended. The witness relating the incident regarded it lightly, saying: "I laughed at him and sent him home. The incident was never mentioned again".

The defendant assigns error upon the trial court's refusal to strike all the

testimony of Orville McCullough to the effect that after eating cake baked in the Langenegger home when ice cream frozen there on July 4, 1937, was also served, he became sick and vomited, symptoms similar to those displayed by the prosecuting witness and other members of the Langenegger family after eating bread, pastries and other food in which flour was an ingredient. We think the testimony was admissible as a link in the chain of circumstances woven in evidence tending to establish the crime and that it was designed, not accidental or the result of mistake. Anyhow, the entire testimony was in on direct examination and the cross-examination concluded before the defendant, by motion to strike, questioned its admissibility. This was too late, even if inadmissible, as it was not. State v. Alford, supra.

Found among defendant's effects in his trunk were two documents which he admitted writing. Both are designated State's Exhibit 7, the first of which is anonymous and reads as follows:

" (Written in ink) Jeff West (Pencil)
arthur langenegger needs your help tonight go at once there is trouble ahead for both of you"

The second paper, obviously defendant's response to a seeming appeal for help by Arthur (Bill) Langenegger or some one in his behalf, was signed by defendant and according to him both were posted on a head-

gate, presumably near his cottage home. It reads as follows:

"(Piece of note paper attached)
Carl Holden
"To Whom it may concern:

"Those people who I consider my friends are men enough to tell me personally when they need my help. I need no one prowling through my house borrowing my shoes and then come galloping back on a horse throwing them and such notes as above attached into my door. Parties who insist on doing the affore said are apt to find themselves needing a doctor and undertaker.

"Carl Holden
"Trouble awaits only those who seek it."

They were attached together when found in his trunk and were introduced as one exhibit. Defendant admitted that the name "Jeff West" written in ink on the anonymous writing was added some time after the penciled portion thereof was written, whether before or after the posting does not appear. The defendant declined to fix the date of these writings or to approximate it, except to say it was not since he began working steadily for the Langeneggers. Pressed to fix a date, he remarked: "I think probably if I had time I could figure it out". The court and jury probably concluded that the defendant was equivocating in his expression of inability to fix the date of these writings. Even the record suggests as much.

■ The objection to the admission of these documents was that no time was fixed (no doubt properly ignored by the court in

the warranted belief that defendant could fix the time if he would); and upon the ground of immateriality and irrelevancy; further, that it had no bearing on the case and could only tend to prejudice the defendant in the minds of the jury. The district attorney's answer to these objections .was that the only purpose in offering the writings was to show the mental attitude of the defendant, particularly toward the Langeneggers. We see no error in the trial court's ruling. The tenor of the second writing read in the light of the first one was to show a wicked and depraved mind directed toward the son of the prosecuting witness, if not the whole family, thus affording some evidence of motive. For this purpose the two writings had relevancy.

Finally, we consider the most serious claim of error. Overruling defendant's objection to its admission and a subsequent motion to strike it from the record and to instruct the jury to disregard same, the trial court admitted in evidence and permitted to be read to the jury a letter designated State's Exhibit 8 and the envelope in which it was mailed designated State's Exhibit 8a. It was a letter addressed to the father of a young man whose acquaintance defendant had made while a student in State Teacher's College in Silver City, New Mexico, in the school year of 1928–1929, when defendant was approximately twenty years of age.

The letter was dated April 30, 1931, and as shown by the envelope in which it was mailed, was posted on the train somewhere between Clovis and Carlsbad on the same date. At the time the letter was mailed, the son of addressee was a student in New Mexico Military Institute at Roswell. It purported to have been written by one R. R. Kevs, as inspector for a private detective agency, expressing fears for the life of the young man unless Carl Holden (the defendant) were removed from the community. The letter is long and rambling. It easily could be characterized by the jury as a threat against the life of the addressee's son and as generally ominous in tenor. There seems no doubt but that the writing and mailing of the letter discloses a specific act of wrongdoing or misconduct by the accused. The state offered it solely for that purpose to affect the credibility of the witness and the court specially charged the jury that it could be considered for no other purpose.

Confronted on the witness stand with the original letter, the defendant readily admitted its authorship and that there was no such person within his knowledge as R. R. Kevs, the purported sender. The only explanation offered by the accused for having written it was that he did it as a joke; that the addressee's son was his friend; and that he, the defendant, was interested in detective work.

The case of State v. Solis, 38 N.M. 538, 37 P.2d 539, is cited and relied upon by the Attorney General in support of the trial court's ruling. The authorities cited in the Solis case, State v. Perkins, 21 N.M. 135, 153 P. 258, and others decided later by this court, abundantly sustain the right to impeach the character of a witness,

even though such witness be the accused himself, by extracting from him on cross-examination admissions of specific acts of misconduct or wrongdoing if such admissions can be thus secured. The purpose of such admissions, of course, is to affect the credibility of the witness. That the trial court is allowed a broad discretion in controlling the extent of such a cross-examination is shown by early territorial decisions as well as later ones since statehood. Territory v. De Gutman, 8 N.M. 92, 42 P. 68; Borrego v. Territory, 8 N.M. 446, 46 P. 349; Territory v. Chavez, 8 N.M. 528, 45 P. 1107; Territory v. Garcia, 15 N.M. 538, 110 P. 838; State v. Perkins, supra; State v. Bailey, 27 N.M. 145, 198 P. 529; State v. Clevenger, 27 N.M. 466, 202 P. 687; State v. Schultz, 34 N.M. 214, 279 P. 561, and State v. Cruz, 34 N.M. 507, 285 P. 500.

The initial objection to admission of this letter was simply that the incident it revealed was too remote in point of time. This objection was not well taken. 28 R. C.L. § 213, page 626, under title "Witnesses"; Scoville v. State, Tex.Cr.App., 77 S. W. 792, and Davis v. State, 52 Tex.Cr.R. 629, 108 S.W. 667. Certainly, we cannot say that the court's action in overruling the objection discloses an abuse of discretion. In defendant's motion to strike the letter and instruct the jury to disregard same, the only grounds stated were that it failed even remotely to connect defendant with the crime charged and "could only tend to prejudice the jury". Of course, it was not offered for the purpose of connecting defendant with the offense for which he was on trial but solely as bearing on his credibility. The court so charged. And the fact that competent evidence on the issue of a defendant's credibility may tend to prejudice him, does not alone exclude it. Undoubtedly, the tendency of all evidence impeaching the character of the accused as a witness is to prejudice him as the defendant. This is one of the hazards he accepts when he presents himself as a witness in his own behalf. The trial court, mindful of the dual capacity in which he appears, should limit the cross-examination where its legitimate probative value on the credibility of the accused as a witness seems obviously outweighed by its illegitimate tendency, effect and often purpose, to prejudice him as a defendant.

After all, the primary responsibility is that of the trial judge whose discretion in such matters is not to be lightly disturbed, even though we may feel that as trial judges our own discretions might have been moved oppositely. This is not the test. Rather it is whether the trial judge's action seems obviously erroneous, arbitrary and unwarranted. We are unable to say as much of his exercise of discretion here reviewed.

The more doubtful aspect of the matter, in the face of a proper objection, would have been whether the introduction in evidence of the letter itself, constituted impeachment of the character of a witness by independent or extraneous evidence, violative of the rule stated in State v. Clevenger, supra. See, also, 3 Wigmore on Evidence,

3rd Ed., §§ 979 and 981. However, since defendant admitted writing the letter and the only way of showing it to be a wrongful act was by reading the same to the jury, its introduction may be outside the rule mentioned in the Clevenger case. Cf. People v. Johnston, 228 N.Y. 332, 127 N.E. 186. Anyhow, we are spared the necessity of deciding.

It follows from what we have said that the record is free from error and that the judgment of the trial court accordingly should be affirmed.

It is so ordered.

BRICE, C. J., and ZINN, MABRY, and BICKLEY, JJ., concur.