699 P.2d 626

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Ronald Edward GILLETTE, a/k/a Gary
Lee Brown, Defendant-Appellant.**

**No. 7667.**

Court of Appeals of New Mexico.

April 11, 1985.

Paul G. Bardacke, Atty. Gen., Carol J. Vigil, Sp. Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Janet Clow, Chief Public Defender, David Stafford, Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

DONNELLY, Chief Judge.

Defendant appeals his convictions of sixteen counts of criminal sexual penetration in the second degree, five counts of attempted first degree murder, one count of arson, one count of residential burglary, and one count of contributing to the delinquency of a minor. Defendant raises eight issues on appeal. We discuss defendant's claim of (1) error in admission of evidence of poison; (2) refusal to permit evidence of prior sexual conduct of victim (points II

and III from the brief-in-chief); (3) insufficient evidence of defendant's position of authority; (4) erroneous admission of photographic evidence; (5) insufficient evidence of burglary; (6) insufficient evidence of attempted murder; and (7) erroneous instructions to the jury. We affirm.

The charges against defendant arise out of a bizarre and tangled scenario. In August 1980, defendant met the victim's family in California and shortly thereafter became a boarder in their home. At the time, Kathleen was living with her three children, including D.M., age 12.[1] D.M. testified that defendant shared a room with him and made sexual advances to him shortly after moving into their home. The child testified that he resisted these advances for about a month, but later submitted. In August 1981, Kathleen decided to move her family to Albuquerque. Defendant came along and continued to live in the household. D.M. testified that defendant engaged in sexual activity with him in New Mexico on the average of twice a week. These incidents occurred between August 1981 and April 1982.

Kathleen asked defendant to move out of her house when she decided that defendant was interfering with the family relationships and after her other son, Tim, told her defendant had approached him sexually. Defendant left in April 1982, and for a time thereafter was allowed to visit D.M. Kathleen did not yet know about D.M. and defendant's sexual relationship. According to Kathleen, defendant and her son were spending too much time together, and she decided that defendant should not see her son at all. Kathleen testified that she became engaged to be married in October 1982, and planned to move the family to Australia.

D.M. testified that after Kathleen had forbidden defendant from having any contact with him, defendant would secretly come to the family residence without his mother's knowledge. According to D.M.,

about once a week at approximately 9:00 p.m., defendant would enter the family residence through an unlocked window and spend the night with him. Sexual activity would occur during these visits.

According to D.M., the usual pattern of defendant's secret visits also occurred on the evening that a fire was set in their home. Tim, a brother of D.M., testified that in the latter part of November 1982, a fire occurred in the attic of their house. After extinguishing the fire, Timothy discovered that a paint can, usually kept in the garage, had been placed inside the home heating furnace and fuel had been spilled in the hallway near the furnace. Tim testified that the furnace was usually turned off at night, but he noticed that the thermostat had been turned all the way up on the night of the fire. The fire department was called after the fire was discovered.

The evening of the fire defendant and D.M. discussed the possible move of the family to Australia. Defendant was quiet in response to the news and, before D.M. fell asleep, defendant stated that maybe in the future the two would get together. Later that night D.M. was awakened and his mother told him that someone had started a fire in the house. Defendant had secretly left sometime earlier. Before going back to sleep, D.M. hid the jacket and shirt defendant had left behind. D.M. testified that his reason for hiding defendant's clothing was that he did not want anyone to know that defendant had been in the house that night.

Arson investigators found evidence of arson in the garage including a Coleman fuel can and a towel used by Tim to wipe up fuel in the hallway of the house. Chemical tests performed by arson investigators established that the liquid found in the hallway near the furnace in the family home was a combustible fuel. An employee of a convenience store near the family residence identified defendant as the per-

---

**1.** On the court's own motion the child will only be referred to by initials and his family will only be referred to by their first names.

son who, on November 21, 1982, had purchased a container of the same brand of fuel as was found in Kathleen's home. Defendant was charged with burglary arising from his unlawful entry of Kathleen's home on November 30, 1982, and arson resulting from the fuel scattered in the hallway and the fire started in the attic.

Kathleen testified that several months later, on February 29, 1983, when she arrived at work at Presbyterian Hospital, a package containing a Dr. Pepper had been left for her by an anonymous person. When she took a drink of the Dr. Pepper she thought it tasted terrible. Two friends, Sharon Erdmann and David Westbrook, also drank from the container and thought there had been something added to the Dr. Pepper. Erdmann and Westbrook noticed that the bottom of the container had been tampered with and resealed. The police were immediately notified. Kathleen was informed, for the first time by detectives investigating the attempted Dr. Pepper poisoning, that D.M. and the defendant had an ongoing sexual relationship.

Chemical tests performed on the contents of the container of Dr. Pepper established that pentobarbital had been mixed with the beverage.[2] Dr. Coleman, the chemist who performed the tests on the contents of the can, testified that pentobarbital is known as a "sleeper or a downer" and is commonly used for death by injection. At the time the pentobarbital was discovered in the can given to Kathleen, defendant was employed at the Good Shepherd Animal Clinic. Defendant admitted that he had access to sodium pentobarbital (which turns into pentobarbital if mixed with Dr. Pepper), the same drug that was used in animal euthanasia at the animal clinic. There was also evidence that defendant had worked as a paramedic and was experienced in administering injections.

## I. CHEMICAL ANALYSIS OF THE DR. PEPPER

Defendant claims he was denied due process for the attempted murder charges because none of the soft drink was left, after testing, for an independent analysis by defendant's chemist. Defendant argues that this denied him the opportunity of exposing exculpatory evidence of the presence of substances in the can.

Both the police and the Environmental Protection Agency (EPA) had been initially involved in the investigation to determine whether the soft drink had been mixed with a toxic substance. The container was taken by the EPA to Dr. Coleman, who analyzed the contents solely to determine the quantity of pentobarbital it contained. Dr. Coleman kept all of his papers and the spectograph analysis of the solution which could be reviewed and used by any other chemist. Dr. Coleman testified that he used all but an insignificant amount of the contents of the liquid in making his analysis, and the small remainder had been discarded. Dr. Dugan, a chemist, said the contents of the Dr. Pepper can could have been analyzed for the presence of other substances if a small amount of the contents of the can had been preserved for analysis.

Defendant relies on *State v. Lovato*, 94 N.M. 780, 617 P.2d 169 (Ct.App.1980) (blood alcohol test administered, analyzed, and destroyed after test completion was inadmissible), for his claim that the trial court denied him due process by admitting the results of the tests of contents of the can in circumstances where he was prevented from doing his own tests on the contents. We do not deem *Lovato* applicable under the facts in the present case. The container of Dr. Pepper was taken to Dr. Coleman by the EPA because it was mixed with a foreign substance. Dr. Coleman testified it was his mission to identify the white insoluble substance in the can of Dr. Pepper. Dr. Coleman was not working on behalf of

---

**2.** A barbituate which is "a common agent in accidental or intentional overdose." P. Parish, *The Doctors & Patients Handbook of Medicines*

*& Drugs*, 49 (1977). Dr. Coleman, a chemist, testified that pentobarbital can cause death if taken in sufficient quantities.

the police. The police did not begin a criminal investigation in the case until sometime after the testing had been completed. The analysis of the soft drink was not part of any police action and was not requested by law enforcement officers.

The issue of the admissibility of the test results is controlled by *Jamison v. State Racing Commission*, 84 N.M. 679, 507 P.2d 426 (1973), and *State v. Stephens*, 93 N.M. 368, 600 P.2d 820 (1979), cited with approval by the court in *State v. Chouinard*, 96 N.M. 658, 634 P.2d 680 (1981), *cert. denied*, 456 U.S. 930, 102 S.Ct. 1980, 72 L.Ed.2d 447 (1982). In *Chouinard* the supreme court reaffirmed the three-part test established to determine if deprivation of evidence is reversible error.

1) Did the state breach some duty or intentionally deprive defendant of the evidence?

2) Was the improperly "suppressed" evidence material?

3) Did the "suppression" prejudice the defendant?

■ Defendant's argument fails on the first and third point. Dr. Coleman was testing the Dr. Pepper for the EPA, not the police department. Since there is no suggestion of complicity between the police department, EPA, and Dr. Coleman, defendant must prove he was prejudiced by his inability to test the substance. *Id.* Prejudice to the defendant must be weighed by the trial court judge on a case-by-case basis balanced against other evidence offered at trial, cross-examination, and defendant's use of the loss in presenting the defense.

■ Accordingly, defendant's due process claim is without merit. There is no substantial basis for supposing that the "lost" evidence would have undercut the prosecution's case in light of the amount of evidence presented by the state. *Id.* In this light, defendant's claim of prejudice is speculative and therefore fails. *State v. Lucero*, 96 N.M. 126, 628 P.2d 696 (Ct.App. 1981).

## II. PRIOR SEXUAL CONDUCT

Defendant claims that the court abused its discretion in not permitting defendant to question D.M. concerning the child's prior sexual conduct with persons other than defendant. This claim goes to the sixteen counts of criminal sexual penetration of a minor for which defendant was convicted.

■ Defendant asserts that the victim's prior sexual conduct was relevant to show that D.M. had consented to the sexual acts engaged in by D.M. and the defendant. Defendant argues that this testimony was necessary because it contradicted the state's argument that defendant had a position of authority over D.M. and was able to use it to coerce D.M. to submit to criminal sexual penetration. As a strictly substantive matter, the defense of consent is not available to defendant because lack of consent is not an element of the crime. NMSA 1978, § 30-9-11(B) (Repl.Pamp.1984); *State v. Jiminez*, 89 N.M. 652, 556 P.2d 60 (Ct.App.1976); NMSA 1978, UJI Crim. 9.44 (Repl.Pamp.1982).

Procedurally there is a major problem with defendant's position. Defendant failed to file a written pretrial motion as required by NMSA 1978, Evid.Rule 413 (Repl.Pamp.1983) and Section 30-9-16 (Repl.Pamp.1984) in order to properly offer evidence at trial of the victim's past sexual conduct.

Defendant was convicted under Section 30-9-11(B)(1), which states:

B. Criminal sexual penetration in the second degree consists of all criminal sexual penetration perpetrated:

(1) on a child thirteen to sixteen years of age when the perpetrator is *in a position of authority over the child and uses this authority to coerce the child to submit*[.] [Emphasis added.]

■ However, evidence of prior sexual conduct is related to the factual problem of whether the child's will might have been controlled by defendant. Although defendant has no substantive right to prove that the relationship between him and the child was consensual, he has a right to attempt

to prove that he did not unduly influence the child and that the child acted of his own free will rather than through coercion. *See* § 30–9–11(B)(1).

Moreover, *State v. Herrera*, 92 N.M. 7, 16, 582 P.2d 384, 393 (Ct.App.), *cert. denied*, 91 N.M. 751, 580 P.2d 972 (1978), states:

> The proper approach, in our opinion, is to recognize that past sexual conduct, in itself, indicates nothing concerning consent in a particular case. This is the starting point because relevancy is not an inherent characteristic of any item of evidence, but exists only as a relation between an item of evidence and a matter properly provable in the case. *State v. Martin*, 90 N.M. 524, 565 P.2d 1041 (Ct.App.1977).
>
> If defendant claims a victim's past sexual conduct is relevant to the issue of the victim's consent, it is up to defendant to make a preliminary showing which indicates relevancy.

■ Defendant was allowed during his case in chief to testify about what D.M. told him at the inception of their relationship about his past sexual conduct. Although defendant was not allowed to introduce the evidence through D.M., the evidence nonetheless was presented to the jury. Defendant was not denied use of the evidence of the child's prior sexual conduct. Under these circumstances, and due to defense counsel's disregard of required statutory procedure, defendant's assertion of error is without merit.

Defendant's contention indicates his recognition that there was evidence of D.M.'s prior sexual conduct with a person other than defendant, because the discussion in his brief is directed to trial court rulings prohibiting the questioning of D.M. and his mother as to that conduct. Defendant contends that D.M.'s own testimony was essential in order "to present his defense * * *." The trial court ruled that the prejudicial nature of this testimony outweighed its probative value. *See* NMSA 1978, § 30–9–16 (Repl.Pamp.1984) and Evid.R. 413 (Repl.Pamp.1983).

■ Related to this assertion is defendant's claim that the trial court erred in allowing D.M. to testify about his sexual conduct with defendant while in California and before moving to New Mexico. This involves prior sexual conduct of D.M. with defendant. According to defendant, the California episodes were irrelevant to the episodes in New Mexico because only the New Mexico episodes were involved in the sex charges being tried. We disagree; the California episodes were relevant. *State v. Minns*, 80 N.M. 269, 454 P.2d 355 (Ct.App. 1969). Anticipating this holding, defendant's alternative argument is that it was unfair to permit the state to introduce evidence of the prior sexual conduct between D.M. and defendant in California and prohibit the defendant from questioning D.M. about his prior sexual conduct with a person other than defendant.

■ Defendant's contentions emphasize the evidence and disregard the proper purpose of such evidence. D.M.'s prior sexual conduct, whether with defendant or another, was relevant insofar as it tended to show that defendant coerced D.M. to submit to sex. NMSA 1978, Evid.R. 401 (Repl. Pamp.1983).

■ Although contradictory inferences could be drawn from D.M.'s testimony on cross-examination by defendant, D.M. testified that he was never forced to have sex with defendant. This goes directly to the issue of coercion by defendant and was testimony by D.M. In addition, defendant testified about what D.M. told him about his past sexual conduct with another. With this evidence before the jury, we cannot hold that the trial court erred in balancing the considerations cited in Section 30–9–16 and Evid.Rule 413 in prohibiting questioning of D.M. about his prior sexual conduct with another. Nor can we hold that it was unfair to permit evidence of D.M.'s prior sexual conduct with defendant because of D.M.'s testimony that his entire sexual relationship with defendant was uncoerced.

Considered in the context of the issue to be decided—coercion—the trial court's rulings as to evidence about D.M.'s prior sexual conduct were not error.

 Defendant also contends that Section 30-9-16, which permits the trial court to limit evidence of a victim's past sexual conduct, is unconstitutional. This argument is without merit. This claim was not raised in the trial court. *City of Portales v. Shiplett*, 67 N.M. 308, 355 P.2d 126 (1960). Moreover, this court in *State v. Herrera*, upheld the challenged statute against a claim of unconstitutionality.

## III. POSITION OF AUTHORITY

Defendant contends there was insufficient evidence to establish that he was in a position of authority and that he used his position as a boarder in the family home to coerce D.M. to submit to criminal sexual penetration.

 "Position of authority" is defined in NMSA 1978, Section 30-9-10(D) (Repl. Pamp.1984) as "that position occupied by a parent, relative, household member, teacher, employer or other person who, by reason of that position, is able to exercise undue influence over a child[.]" "Undue influence," as a common law concept, was defined in *Trigg v. Trigg*, 37 N.M. 296, 301, 22 P.2d 119, 123 (1933), as "the result of moral, social, or domestic force exerted upon a party, so as to control the free action of his will * * *." *See also Hughes v. Hughes*, 96 N.M. 719, 634 P.2d 1271 (1981). Submission to the request of an authority figure is coerced if it is achieved through undue influence or affected by external forces.

The evidence bearing on defendant's position of authority in the household and his use of authority to coerce D.M. to engage in sexual acts is substantial. When defendant first moved in with the family, defendant was a physically large, twenty-four-year-old, who had been in the Air Force and had worked as a paramedic and as a security guard. D.M. was a twelve-year-old child. Defendant acted as D.M.'s "boss" on many occasions. Defendant's position in the family home was described as a "babysitter." Evidence was presented that defendant greatly influenced D.M., that the child listened more to defendant than to his mother, and that defendant had assumed the role of an authority figure in the home. Defendant testified that he had a close, confidential relationship with D.M. and that the child frequently sought his advice.

 The foregoing facts and the reasonable inferences that can be drawn from them provide a basis from which a jury could properly find, beyond a reasonable doubt, that defendant was in a position of authority and used his authority to coerce the child into submitting to the charged sexual acts.

## IV. PHOTOGRAPH EVIDENCE

The state introduced into evidence a photograph of defendant and D.M. in California at a time when the child was younger and smaller. Defendant objected on the ground that the photograph was not relevant to the charges in New Mexico. The photograph was admitted into evidence over defendant's objection.

 Photographs are admissible for the purpose of corroborating and illustrating a witness's testimony. *State v. Hutchinson*, 99 N.M. 616, 661 P.2d 1315 (1983). Here, the photograph served to illustrate the victim's immaturity and small stature at the time defendant first moved into the residence, compared to D.M.'s present matured appearance, and corroborated D.M.'s testimony about defendant's physical capability of exerting undue influence over him. *E.g., State v. Jacobs*, 91 N.M. 445, 575 P.2d 954 (Ct.App.), *cert. denied*, 91 N.M. 491, 576 P.2d 297 (1978) (photograph admissible to show defendant's appearance at the time of arrest since his present appearance was substantially different).

## V. BURGLARY OF THE FAMILY HOME

Defendant claims he had authority to enter the house and that it was error to

permit the charge of burglary to be submitted to the jury. In arguing this point, defendant cites the evidence most favorable to his position.

In contrast, the state cited evidence that defendant was told by Kathleen to move out of her house because of the improper influence defendant was exerting over D.M. Kathleen told defendant not to come to the home or to contact D.M. Kathleen also told D.M. he was forbidden to have any further contact with defendant. D.M. had no authority to allow defendant into the residence.

The night of the fire in the home, defendant parked his vehicle several blocks away and surreptitiously entered the house through D.M.'s bedroom window. Viewed in a light most favorable to the verdict, there is substantial evidence of an unauthorized entry of the residence by defendant. NMSA 1978, § 30–16–3 (Repl.Pamp.1984); *see also State v. Ortiz*, 92 N.M. 166, 584 P.2d 1306 (Ct.App.), *cert. denied*, 92 N.M. 79, 582 P.2d 1292 (1978).

## VI. ATTEMPTED MURDER

Defendant claims that he lacked the specific intent necessary to support a conviction of attempted murder of Sharon Erdmann and David Westbrook. Erdmann and Westbrook had tasted the Dr. Pepper which was anonymously delivered to Kathleen on February 29, 1983. Neither suffered any injury. Subsequent tests revealed that pentobarbital had been placed in the container of Dr. Pepper through a puncture in the bottom of the can.

Since no specific intent to murder Erdmann and Westbrook was shown, the issue on appeal is whether transferred intent can be applied to attempted murder. This is a question of first impression in New Mexico. New Mexico has previously used the doctrine of transferred intent to sustain convictions for murders of unintended victims. *State v. Carpio*, 27 N.M. 265, 199 P. 1012 (1921) (upholding the murder conviction of defendant who fired several shots at his intended victim and killed another); Annot., 18 A.L.R. 917 (1922); *State v. Hamilton*,

89 N.M. 746, 557 P.2d 1095 (1976) (upholding two murder convictions for the death of intended as well as unintended victim). *See also Coston v. State*, 144 Fla. 676, 198 So. 467 (1940) (upholding murder conviction for death of unintended poison victim).

Several jurisdictions have refused to apply transferred intent to attempted murder cases, where an unintended victim has been injured but not killed. *Jones v. State*, 159 Ark. 215, 251 S.W. 690 (1923) (court rejected use of transferred intent for assault with intent to kill where unintended victim was only slightly injured). *See also* R. Perkins & R. Boyce, *Criminal Law*, ch. 7, § 8(C) at 924–25 (3d ed. 1982); Annot., 54 A.L.R.3d 612 (1973).

The court in *People v. Neal*, 97 Cal. App.2d 668, 218 P.2d 556 (1950) reached a different result. In an attempt to kill Theodore Raymond, defendant broke a screen on a bedroom window, threw a flammable liquid on the bed and interior of the room, and ignited the liquid. Raymond's wife had been asleep in bed with her husband. As a result of defendant's acts, Mrs. Raymond's hair and clothing were burned, and she was severely injured. Defendant was charged with the attempted murder of both Theodore Raymond and Myrtle Mae Raymond. On appeal, defendant argued *inter alia* that there was no proof of a specific intent to murder Mrs. Raymond and therefore his attempted murder conviction of Mrs. Raymond should be reversed.

The court upheld defendant's convictions of attempted murder of both Raymond and his wife, noting in pertinent part:

Where an attempt to commit a crime is charged, two important elements are essential to conviction: a specific intent to commit the crime, and a direct ineffectual act toward its commission. *People v. Miller*, 2 Cal.2d 527, 530, 42 P.2d 308, 98 A.L.R. 913.

\* \* \* \* \* \*

The fact that the intent to murder may have been directed toward Mr. Raymond did not the less make the crime complete as regards the charge of attempt to mur-

der Mrs. Raymond. *"[W]here one intends to assault or kill a certain person, and by mistake or inadvertance assaults or kills another in his stead, it is nevertheless a crime, and the intent is transferred from the party who was intended to the other." People v. Wells,* 145 Cal. 138, 140, 78 P. 470, 471; *People v. Rothrock,* 21 Cal.App.2d 116, 119, 68 P.2d 364; *People v. Walker,* 76 Cal. App.2d 10, 15, 172 P.2d 380. 218 P.2d at 559 (emphasis added).

■ Similarly, in *State v. Thomas,* 127 La. 576, 53 So. 868 (1910), the Supreme Court of Louisiana considered a case where defendant, in the midst of a quarrel, shot at his intended victim (Washington), and wounded both the intended victim and a third party (Alma Meyers) who was standing nearby. Defendant was charged with shooting Alma Meyers " 'with intent to commit murder.' " Defendant argued on appeal that the shooting of Meyers was accidental and that he lacked the intent necessary to establish the crime of shooting Meyers with an intent to commit murder. The court in *State v. Thomas* affirmed the conviction. The court held "the allegations of the indictment [are] fully proved, if there is the shooting of any person,—no matter of what person,—and the shooting is done with a dangerous weapon and with intent to commit murder * * * there is nothing in the terms of the statute requiring that the person who was shot [must] have been the person intended in fact to be murdered, or who was shot at." *Id.* at 869. Since a murder conviction will be upheld even though the specific intent to kill was directed at someone other than the unintended victim, it follows that an attempted murder conviction may be upheld on the same grounds. "[I]t should not be necessary to prove the malice aforethought was directed toward the person actually shot just because injury, rather than death, resulted. *An attempt to commit murder* should not require proof of an intention not necessary to sustain a charge of murder." *State v. Alford,* 260 Iowa 939, 940, 151 N.W.2d 573, 574 (1967) (emphasis added).

Moreover, in *People v. Rothrock,* 21 Cal. App.2d 116, 68 P.2d 364 (1937), a customer of a restaurant shot at a waitress wounding her, and the bullet passed through her body and struck a customer. The court affirmed defendant's conviction for attempted murder of both the waitress and the customer. On appeal, the state's contention of transferred intent was upheld, noting that although the intent to kill might have been directed toward the waitress, this did not make the crime less complete with regard to the charge of attempted murder of the customer. The court held that " '[w]here one intends to assault or kill a certain person, and by mistake or inadvertence assaults or kills another in his stead, it is nevertheless a crime, and the intent is transferred from the party who was intended to the other.' " 68 P.2d at 366 (citing *People v. Wells,* 145 Cal. 138, 140, 78 P. 470, 471 (1904)).

■ Defendant also argues that his conviction on these counts should be reversed because the unintended victims were not injured. Proof of attempted murder does not require that the victim be injured. NMSA 1978, § 30–28–1 (Repl. Pamp.1984); UJI Crim. 28.10 (Repl.Pamp. 1982); *Commonwealth v. Mapp,* 232 Pa. Super. 435, 335 A.2d 779 (1975). Further, proof of attempted murder of an unintended victim, through the use of the doctrine of transferred intent, does not require proof that the unintended victim was injured. *People v. Smith,* 94 Ill.App.3d 969, 50 Ill.Dec. 296, 419 N.E.2d 404 (1981); *Kitchens v. State,* 149 Tex.Cr.R. 135, 192 S.W.2d 449 (1946).

■ In the present case, each of the victims ingested a quantity of the poison but was not harmed. Under these facts, the danger to the victims was real and was proof of a present ability to kill. In *State v. Ready,* 110 S.C. 177, 96 S.E. 287, 288 (1918), the court held: "it is of no consequence that there may not have been enough [lye] to cause death or serious sickness [unless consumed in sufficient quantity], since the gravamen of the offense [at-

tempted murder] is the felonious intent manifested in an attempt to poison." *E.g.,* *State v. Holden,* 45 N.M. 147, 113 P.2d 171 (1941) (defendant convicted of poisoning food with intent to injure and kill).

██ In the present case, defendant sent a poisoned drink to Kathleen intending to kill her. If the substance is ingested by the intended victim, as well as by others who work with her, defendant's felonious intent to kill is transferred to others who foreseeably may also ingest the poison. The intent of the defendant may be said to follow the container of poison and the defendant may be found guilty of attempted murder of each individual who ingested the poison. *E.g., People v. Gaither,* 173 Cal. App.2d 662, 343 P.2d 799 (1959), *cert. denied,* 362 U.S. 991, 80 S.Ct. 1082, 4 L.Ed.2d 1023 (1960) (seven attempted murder convictions upheld when poison candy sent to one person but seven members of the household could have eaten it).

Defendant's convictions of attempting to kill both Erdmann and Westbrook by poison are supported by the record and the requisite transferred intent. These convictions are affirmed.

### VII. JURY INSTRUCTIONS

Defendant objects on appeal to two jury instructions: numbers 17 and 18, relating to the charge of attempted murder of Westbrook and Erdmann. At trial, defense counsel objected to the instructions on two grounds. He argued that attempted murder instructions should not have been given because defendant did not intend to kill Kathleen's co-workers and that the doctrine of transferred intent did not apply to attempted murder. The two instructions in question are NMSA 1978, UJI Crim. 2.00 (Repl.Pamp.1982) (first degree murder) and instruction 28.10 (initiatory crimes).

██ As previously discussed, the doctrine of transferred intent applies to both murder and attempted murder. In a murder case, if A shot at B but killed C, then it is proper to instruct the jury that A's intent to kill B was transferred to C.

*See State v. Carpio; State v. Hamilton.* The same rule applies to defendant's convictions for the attempted murder of Westbrook and Erdmann. If A attempts to kill B but C becomes the actual object of the attempt, it is proper to instruct the jury that A attempted to kill C. In the present case, the wording in the instructions that defendant intended to kill Erdmann and Westbrook was therefore proper.

Counsel for defendant also objected to a portion of the two instructions which read: "The act of the defendant caused * * * [Westbrook and Erdmann] to drink some poison, and the defendant's act placed [Westbrook and Erdmann's] life in danger[.]" Defendant argues that the two instructions deviated from the Uniform Jury Instruction (UJI Crim. 28.10) and were therefore improper.

██ The language added to UJI Crim. 28.10 involves an issue of first impression in New Mexico. A jury instruction applying transferred intent to an attempt to commit a felony, has not been formally adopted. Defense counsel's argument that a court cannot deviate from the Uniform Jury Instruction is not controlling under the facts in this case. UJI Criminal General Use Note (Repl.Pamp.1982) provides that "[f]or a crime for which no uniform instruction on essential elements is provided, an appropriate instruction stating the essential elements must be drafted."

██ The trial judge noted in the present case that the additional language was added to limit and specify the persons to whom the attempted murder by poison charges were applicable, namely, those who drank the poison and had their lives endangered. This was a reasonable addition to the instruction by the judge and properly recognizes the doctrine of transferred intent.

██ Moreover, the standard of review for determining if instructions which deviate from the Uniform Jury Instructions constitute reversible error is "the slightest evidence of prejudice." *State v. Sanders,* 93 N.M. 450, 451, 601 P.2d 83 (Ct.App.

1979). Defendant does not argue prejudice. Without such a showing, there is no reversible error.

The convictions and sentences are affirmed.

WOOD, J., concurs.

HENDLEY, J., dissenting.

HENDLEY, Judge (dissenting).

I dissent only from the "Attempted Murder" section of the majority opinion which deals with the doctrine of transferred intent.

The question is whether the doctrine of transferred intent will apply so as to support the conviction of defendant for attempted first degree murder of Westbrook and Erdmann. I do not question the fact that our statute will support a charge of attempted first degree murder based on the doctrine of transferred intent. New Mexico has long recognized the doctrine of transferred intent. *State v. Carpio*, 27 N.M. 265, 199 P. 1012, 18 A.L.R. 914 (1921). The doctrine allows the elements of malice or intent to be demonstrated when an unintended victim is killed. *See State v. Hamilton*, 89 N.M. 746, 557 P.2d 1095 (1976), and cases cited therein.

As stated in R. Perkins & R. Boyce, *Criminal Law*, ch. 7, Section 8(C) (3d ed. 1982), at 924–25:

> If, without justification, excuse or mitigation, **D** with intent to kill **A** fires a shot which misses **A** but unexpectedly causes the death of **B**, **D** is guilty of murder. To speak of transferring the malice from **A** to **B** is merely to offer an unsound explanation (carried over from the law of torts) to support a very sound conclusion. The proper explanation is that **D** is guilty of murder in such a case because all elements of the offense are present, with mention if it seems necessary of the fact that as a crime the wrong was committed against the state. . . .

> If, without justification, excuse or mitigation **D** with intent to kill **A** fires a shot which misses **A** but unexpectedly inflicts a non-fatal injury upon **B**, **D** is guilty of

an attempt to commit murder,—but the attempt was to murder **A** whom **D** was trying to kill and not **B** who was hit quite accidentally. And so far as the criminal law is concerned there is no transfer of this intent from one to the other so as to make **D** guilty of an attempt to murder **B**. [Footnote omitted.] Hence an indictment or information charging an attempt to murder **B**, or (under statute) an assault with intent to murder **B**, will not support a conviction if the evidence shows that the injury to **B** was accidental and the only intent was to murder **A**.[24]

\* \* \* \* \* \*

---

[24] *Lacefield v. State*, 34 Ark. 275 (1879); *Jones v. State*, 159 Ark. 215, 251 S.W. 690 (1923); *Commonwealth v. Morgan*, 74 Ky. 601 (1876); *State v. Mulhall*, 199 Mo. 202, 97 S.W. 583 (1906); *State v. Williamson*, 203 Mo. 591, 102 S.W. 519 (1907); *State v. Shanley*, 20 S.D. 18, 104 N.W. 522 (1905); *People v. Robinson*, 6 Utah 101 [21 P. 403] (1889); *Rex v. Holt*, 7 Car. & P. 518, 173 Eng.Rep. 229 (1836).

There was no evidence in the instant case which indicated that defendant was even aware of the existence of Westbrook and Erdmann. *State v. Martin*, 342 Mo. 1089, 119 S.W.2d 298 (1938). Therefore, the convictions of attempted murder as relates to Westbrook and Erdmann should be reversed for a failure of proof. *State v. Malouff*, 81 N.M. 619, 471 P.2d 189 (Ct. App.1970).

In my view, the majority extends the doctrine beyond reasonable bounds. Will the next extension be to all those who handled the can of Dr. Pepper, or maybe all those who were in the hospital at the time the Dr. Pepper was delivered? I would not extend the doctrine as has been done by the majority.

Accordingly, I dissent.